# EX PARTE UNITED STATES, PETITIONER.

## PETITION FOR WRIT OF MANDAMUS.

No. 11, Original. Argued January 10, 11, 1916.—Decided December 4, 1916.

Mandamus, out of this court, is a proper remedy for enforcing a criminal sentence where the District Court which passed it has defeated its execution by an *ultra vires* order of suspension.

The proceeding should be directed to the District Judge, with a view to the annulment of the order of suspension; not to the clerk with a view to the issuance of a commitment in spite of it.

An accused person was duly sentenced in a District Court of the United States pursuant to an act of Congress, and the court then immediately made an order that execution of the sentence be suspended "during the good behavior of the defendant," the effect of which, if sustained, would have been to exempt him permanently and absolutely from the punishment provided by the act and reflected in the sentence. *Held,* that such a suspension—the legal equivalent of an absolute and permanent refusal to impose any sentence under the statute—was beyond the power of the court.

The Constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment; to the judiciary the power to try offenses under those laws and impose punishment within the limits and according to the methods therein provided; to the executive the power to relieve from the punishment so fixed by law and so judicially ascertained and imposed.

The power of Congress to fix punishment for crime includes the power, by probation or other suitable legislation, to equip the courts in advance with such latitude of discretion as will enable them to vary and control the application of punishment to suit the exigencies of each case, in accord with obvious considerations of humanity and public well-being;

But the courts, albeit under the Constitution they are possessed inherently of a judicial, discretionary authority which is ample for the wise performance of their duties in the trying of offenses and imposing of penalties as the laws provide, have no inherent constitutional power to mitigate or avert those penalties by refusing to inflict them in individual cases.

*Semble*, that, at common law, while the courts exercised a discretion to suspend either imposition or execution of sentence temporarily for purposes and in ways consistent with the due enforcement of the penal laws, so as to facilitate action by the pardoning power and avoid miscarriages of justice, they neither possessed nor claimed the power of permanent refusal to enforce them.

In weight and reason the decisions of the state courts deny the power of suspension here in question.

The order of suspension, being essentially unconstitutional, may not be sustained because it accords with a practice (of long standing though intermittent and not universal) indulged for the highest motives by many federal judges in Ohio and elsewhere.

The hardships and wrongs resulting from this practice and its annulment address themselves to the pardoning power; the evils which the practice was designed to avoid may be remedied for the future by appropriate legislation.

Under the exceptional circumstances of the case, this court, exercising its discretion, to the end that ample time may be afforded for executive clemency or such other action as the situation may require, directs that the writ of mandamus do not issue until the end of the term, unless earlier requested by the United States.

Upon application of the Government, presented by the Attorney General, a rule was made upon Honorable John M. Killits, Judge of the District Court of the United States for the Northern District of Ohio, directing that he show cause why a writ of mandamus should not issue requiring him to set aside the order described in the opinion. The case was heard upon the Government's

petition, the respondent's return, and the Government's reply. The facts are stated in the opinion.

*The Attorney General* and *Mr. Assistant Attorney General Wallace*, with whom *The Solicitor General* was on the briefs, for the United States:

It is the function of the judiciary to hear and determine cases and enforce determination by judicial process. The District Courts and Judges derive their power from the Constitution and the acts of Congress and from them alone. Article III, § 2, limits it to "cases" and "controversies." Federal judges are sworn to "administer justice" (Rev. Stat., § 712); and many sections of the Revised Statutes and the Judicial and Penal Codes prove by plain words that Congress expects the court and judge to hear and determine, and enter final judgments, and to carry those judgments into effect. The penal laws are mandatory. In varying expression they prescribe that punishment *shall* be inflicted. This direction is not obeyed until the punishment has been actually enforced.

The power to pardon, including the power to reprieve or commute, belongs to the Executive alone. *United States* v. *Klein*, 13 Wall. 128; *Ex parte Wells*, 18 How. 307; *Ex parte Garland*, 4 Wall. 333. *The Laura*, 114 U. S. 411, concerns only fines. If the power here in question appertain to the pardoning power, it cannot belong to the court; if it be not a power of pardon, the court could only acquire it through act of Congress or common law. See Blackstone, Tucker's ed., Book IV, ch. xxxi, p. 397. Congress has never attempted to bestow such a power on the District Courts or Judges. It has merely conferred a limited power of parole on judges in the District of Columbia (36 Stat. 864). If it had ever meant to confer so wide a power, it would have said so plainly. There are laws which provide for stay of execution on fines and

penalties in certain specific instances; for avoiding in-
definite imprisonment on account of fines and costs; for
motions for new trials, motions in arrest of judgment, and
writs of error.    Otherwise, the federal statutes evince a
plain intention that sentence must be prompt and execu-
tion likewise.

Section 722 of the Revised Statutes, even if applicable
to supply power, only operates where the federal laws
are deficient in details.    And the common law, as modified,
may only be resorted to under that section to govern in
the disposition of the case and the infliction of punishment.
To resort to the local law for means to avoid inflicting
punishment would offend § 722 as well as the related
federal laws generally.    But even if resort were to be had
to the common law as modified, there is neither a common
law nor any statute of Ohio conferring the power here
involved.    Courts have inherent power to suspend sen-
tence while awaiting determination of some question upon
the event of which depends the legal propriety of enforcing
sentence, this being essential to due administration of the
law.    Arbitrary, capricious or indefinite suspension, on
the other hand, destroys the due administration of the
law, and transcends all inherent power.    *Cf. Kendall* v.
*United States*, 12 Pet. 524; *Porto Rico* v. *Rosaly*, 227 U. S.
270; *Interstate Commerce Commission* v. *Brimson*, 154
U. S. 479.    A capricious suspension of the imposition of
sentence is essentially a nonjudicial act, for it leaves the
convict enjoying all his civil rights as well as immunity
from punishment.    Though in a less degree, the same is
true of a capricious suspension of execution.    Each, in
effect, involves an exercise of the pardoning power; for
while civil rights are not preserved or restored by a sus-
pension of execution, no more are they by a commutation
of sentence by the President.    Of course, if a judge (after
sentence and commitment) were to grant a parole under
authority of some valid act of Congress, he would then

be enforcing the law, because the parole would be a statutory element of every punishment.

This court has frequently intimated that it does not consider it an inherent power of federal courts to capriciously stay proceedings upon their judgments or sentences. *Ex parte Gordon*, 1 Black, 503; *United States* v. *Mayer*, 235 U. S. 55.

In *Pointer* v. *United States*, 151 U. S. 396, the question whether authority existed to suspend sentence indefinitely was mooted but not decided. The common law did not allow it, and in this country the reasoning and the great weight of the state decisions condemn it.

The contrary state decisions are based on misconceptions of the common law or for other reasons are unsatisfactory. They relate almost entirely to delays in imposing sentence rather than suspension of execution. Of the cases usually referred to as supporting the power [citing decisions from New York, Michigan, New Jersey, New Hampshire, North Carolina, Florida, Massachusetts, Maine, California, Pennsylvania and Ohio] all save *Weber* v. *State*, 58 Ohio St. 616, and *State* v. *White*, 117 N. Car. 806, involve only postponement of the imposition of sentence. The expression in *Weber* v. *State, supra*, is a *dictum*.

Even a decision by the Ohio court would not bind this court upon a question of inherent or common-law powers. See Wells on Jurisdiction of Courts, §§ 208, 304; *Smith* v. *Alabama*, 124 U. S. 465; *Ex parte Wells*, 18 How. 310. Further as to the Ohio view see *State* v. *Baker*, 3 Ohio N. P. Rep. N. S. 624; 6 Page & Adams Anno. Ohio General Code, note, § 13698, p. 644; *Sterling* v. *Drake*, 29 Ohio St. 457; *Ohio* v. *Radcliffe* (Ct. Common Pleas, Franklin County), Ohio Law Bulletin, November 15, 1915.

The court may not judicially notice what the lower federal courts have done in similar cases. From the return and reply thereto, however, enough conceded facts

appear to show that (1) the practice never was alike in all parts of the United States; (2) within single States, the practice, in some cases, differed in different districts; (3) within a single district the practice at one period would be one way and at another period the other way; (4) many judges exercised the function without any claim of right other than the right of necessity, some even admitting their lack of power; (5) after 1891 and 1894, respectively, whenever exercised, it was in the face of the *Wilson Case,* 46 Fed. Rep. 748, and the *Pointer Case,* 151 U. S. 396, 420; and (6) it was always done in the face of statutes prescribing the punishment for crimes, and the established principle of public policy that offenders against the law should suffer its penalties. This practice being neither general nor consistent nor conformable to statutes or constitution, cannot be considered. *United States* v. *Buchanan,* 8 How. 82; *Thompson* v. *Riggs,* 5 Wall. 663; *United States* v. *Macdaniel,* 7 Pet. 1; *Basey* v. *Gallagher,* 20 Wall. 670. The *Midwest Oil Company Case,* 236 U. S. 459, is readily distinguished.

Humanitarian arguments do not touch the question of power or affect the necessity of preserving the Constitution. Ample relief may be afforded by enlarging the general parole law (36 Stat. 819). Judicial suspension opposes teachings of advanced criminology, with which the Government is in entire sympathy.

The respondent, *Hon. John M. Killits,* in his return to the rule to show cause and in a memorandum prepared by him in support thereof claimed: That the power of the court may be exercised broadly either by deferring the imposition or suspending the execution of sentence if such step seems consonant with the best interests of society—as where the minimum penalty named in a statute is disproportionate to the criminality involved in the particular offense, or where the law may be vindicated

and the individual saved, consistently. In a detailed statement, accompanied by much argument and illustration, the benefits accruing from the practice, in convenience of administration, in justice to the offender, and in the upbuilding of society, were eloquently set forth, together with reasons for believing that no adequate substitute may be provided.

In discussing the question in its legal and constitutional aspects, he dwelt particularly upon the practice of many federal courts and judges and the acquiescence of the Government generally. Also upon the common law and the practice in Ohio.

Local practice is significant of the common-law power. In Ohio the inherent power of the state court to suspend execution is no longer open to question. *Weber* v. *State,* 58 Ohio St. 616; *State* v. *Whiting,* 83 Ohio St. 447. In all discussion of the subject, judicial and lay, it is conceded that the power in both aspects existed in the common-law courts in 1787. See 49 American Law Review, 709, 713; *Gehrmann* v. *Osborne,* 79 N. J. Eq. 430, 441.

*Mr. Edwin J. Marshall* for respondent:

The power existed at common law. Hale's Pleas of the Crown, Vol. I, pp. 367, 19, 26; Vol. II, pp. 412, 401, 309, 35; Hawkins' Pleas of the Crown, Vol. II, ch. 51, § 8; ch. 33, § 144; ch. 6, § 8; ch. 15, §§ 40, 65; 1 Chitty's Crim. Law, ch. xix, p. 757; 2 Dyer, 235a; 2 Dyer, 205a; 2 Dyer, 165a. Although these authorities, confessedly, leave in some doubt whether indefinite suspension was a common-law power, they tend strongly to uphold it. Reprieves were either *ex arbitrio judicis* or *ex necessitate legis.* The latter covered all cases now dealt with by temporary suspensions, as for insanity, pregnancy, etc. The former seem to have applied whenever it appeared that injustice would result from conviction or execution. This power was an implied common-law exception to the statutory

duty to punish. Courts reprieved before and after judgment, to allow opportunity to apply for pardon and for other reasons inconsistent with a strict and invariable duty to punish. If sentences could be suspended for limited times in avoidance of injustices, why not indefinitely? Hale says reprieves were granted after conviction of small felonies as well as on capital convictions, and the cases in Dyer show that the justices controlled the execution of judgments. See further *Queen* v. *Richardson,* 8 Dowling's Practice Cases, 511 (1840); *Regina* v. *Ryan,* 7 Cox Crim. Cas. 109 (1855); 9 American Law Review, 600 (1875); *King* v. *Inhabitants of Wandsworth,* 1 Barn. & Ald. 63 (1817); *Rex* v. *Inhabitants of Southampton,* 2 Chitty, 215 (1818). But see also *King* v. *Inhabitants of the County of Oxford,* 13 East. 411 (1811). The power might have had its origin in the "law of nature" conception (Blackstone Comm., Intro., § 2). It is consistent with the duty to "administer justice." While modern decisions, based on these common-law authorities, disagree in their interpretations (see *Gehrmann* v. *Osborne,* 79 N. J. Eq. 430 (1911); *People ex rel. Forsyth* v. *Court of Sessions,* 141 N. Y. 288 (1894)), long and continuous exercise by state and federal judges affords the best reason for believing that the power existed at common law. *State* v. *Crook,* 115 N. Car. 760 (1894). The exercise may have been common in England and yet no records made in the ancient reports, just as it has been frequent here in the federal practice though evidenced by barely a reported case.

Analysis of the decisions of the various States and Territories shows that some courts affirm the power broadly, others only as to imposition of sentence, others deny it *in toto,* and some, while they disown it in words, have applied it indirectly where justice demanded. Some base the denial on the executive power of pardon. The distinction between the power to delay imposing sentence and the power to suspend execution is illusory in reason,

and not recognized at common law. Many state decisions uphold the one power and some uphold the other also. The following cases in this court have some bearing: *United States* v. *Pile*, 130 U. S. 280; *Pointer* v. *United States*, 151 U. S. 396; *Ex parte Wells*, 18 How. 307; *United States* v. *Wilson*, 7 Pet. 150; *Whisky Cases*, 99 U. S. 594; *Nobles* v. *Georgia*, 168 U. S. 398. The power was exercised in *United States* v. *Gilbert*, Fed. Cas. No. 15,205; and (in principle) in *United States* v. *Blaisdell*, 3 Benedict, 132.

If the power does not exist in the courts, by parity the District Attorneys may not *nolle* indictments, the courts may not impose concurrent sentences, and neither may grant immunity to accomplices who testify. None of these court powers is derived from statute. All rest on practice and general acquiescence and the judicial duty to administer justice with humanity. If it be true that the power of suspension was limited at common law, it has grown with the changes in our institutions, and in our attitude toward the criminal. Its origin was judicial, not regal, as some courts say. In either event it inheres in the common-law conception of "courts," intended when that word appears in constitution and statute. If the practice has become a custom, the custom may become law even to the enlargement of judicial powers through its influence on the construction of statutes. The acquiescence of the executive and legislative branches, and the great evils which this power alone can properly mitigate, should be considered.

The power is inherent in the federal courts. The word "courts" in the Constitution carries the power if it existed at common law. That law (perhaps as modified) grafts the exception on all statutes imposing penalties. See also Rev. Stat., § 722. If not inherent, it is at least part of the courts' equipment until withdrawn by statute. *Howard* v. *United States*, 75 Fed. Rep. 986; *In re Henry*, 123 U. S. 372. In no other way these courts have acquired

power to impose concurrent sentences. *United States* v. *Patterson*, 29 Fed. Rep. 775; *Kirkman* v. *McClaughry*, 152 Fed. Rep. 255; *Ex parte Peake*, 144 Fed. Rep. 1016. Where Congress is silent federal courts are under common-law rules in administering criminal law. *Howard* v. *United States*, 75 Fed. Rep. 986; *United States* v. *Nye*, 4 Fed. Rep. 888; *Erwin* v. *United States*, 37 Fed. Rep. 470; *United States* v. *Maxwell*, 3 Dill. 275. [See also *United States* v. *Reid*, 12 How. 361, 365, and *Withaup* v. *United States*, (C. C. A.) 127 Fed. Rep. 530. REPORTER.] The power to *nolle* comes in the same way.

The continuous exercise amounts to a construction of the federal statutes supporting the power. *Stuart* v. *Laird*, 1 Cranch, 299; *McKeen* v. *Delancy's Lessee*, 5 Cranch, 22; *Fairbank* v. *United States*, 181 U. S. 283; *The Laura*, 114 U. S. 411; *Bank of United States* v. *Halstead*, 10 Wheat. 51; *Atkins* v. *Fiber Disintegrating Co.*, 18 Wall. 272, and other cases. The same principle sustains developments of the practice, for, if practice can construe, it may also modify the constructions of, the statutes.

There is no intrusion on the pardoning power. The two powers, judicial and regal, existed at common law and we inherited the duality. *Ex parte Wells*, 18 How. 307; *United States* v. *Wilson*, 7 Pet. 150. Civil disabilities are not removed by the court's action. *People ex rel. Forsyth* v. *Court of Sessions*, 141 N. Y. 288; *People* v. *Stickle*, 156 Michigan, 557; *Spencer* v. *State*, 125 Tennessee, 64; *State* v. *Addy*, 43 N. J. L. 113. The two powers are harmonious. All branches of the Government have acquiesced. *Brown* v. *Walker*, 161 U. S. 591, holds that general amnesty laws are allowable, and *The Laura*, 114 U. S. 411, that fines and penalties may be remitted by subordinate officers under sanction of statute and long practice and acquiescence.

The defendant may even have a right to a suspension of sentence to apply for a pardon. *Ex parte Wells*, 18

How. 307; *Allen* v. *State*, Martin & Yerger, 294; *Crane* v. *State*, 94 Tennessee, 98; *State* v. *Chitty*, 1 S. Car. (Bailey) 379; *State* v. *Abbott*, 87 S. Car. 466. It then becomes a judicial duty to suspend sentence until pardon is refused.

By leave of court, a memorandum was submitted by the *New York State Probation Commission*, and a brief explaining and supporting the practice in the First Circuit, by *Mr. Richard W. Hale* and *Mr. Frank W. Grinnell*.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The accused pleading guilty to an indictment charging him in several counts with embezzling the money of a national bank of which he was an officer and making false entries in its books in violation of § 5209, Revised Statutes, was sentenced to imprisonment in the penitentiary for five years, the shortest term which under the statute could have been imposed upon him. At once at his request over the objection of the United States District Attorney the court ordered "that the execution of the sentence be, and it is hereby suspended during the good behavior of the defendant, and for the purpose of this case this term of this court is kept open for five years." The United States moved to set this order aside on the ground that as it was not a mere temporary suspension of the sentence to enable legal proceedings pending or contemplated to revise it to be taken, or application for pardon to be made, or any other legal relief against the sentence to be resorted to, but on the contrary as it was a permanent suspension based upon considerations extraneous to the legality of the conviction or the duty to enforce the sentence, the order of suspension was void as it was equivalent to a refusal to carry out the statute. The motion was denied. In the opinion giving its reasons for so doing the court, conceding that the suspension was permanent, stated the

general considerations which it deemed it was required
to take into view in deciding whether the sentence should
be enforced, conceding the legality of the conviction and
sentence and their finality, as follows:

"Modern notions respecting the treatment of law
breakers abandon the theory that the imposition of the
sentence is solely to punish, and now the best thought
considers three elements properly to enter into the treat-
ment of every criminal case after conviction. Punishment
in some measure is still the object of sentence, but affecting
its extent and character we consider the effect of the situa-
tion upon the individual as tending to reform him from or
to confirm him in a criminal career, and also the relation
his case bears to the community in the effect of the disposi-
tion of it upon others of criminal tendencies."

After pointing out the peculiar aptitude possessed by a
trial judge for the appreciation of such conditions and the
imperative duty which rested upon such judge to consider
and weigh the matters stated and to determine as an in-
herent attribute of judicial power whether a permanent
suspension of the term of imprisonment fixed by the stat-
ute should be ordered, the circumstances upon which it
was concluded that a permanent suspension should be
directed were stated in part as follows:

"We took into account the peculiar circumstances under
which his crime was committed, having regard to the
temptations which from time to time encompassed him,
and his personal necessities, and the purposes for which
his appropriations were made. Also, the fact that his
friends made his employers whole, and that otherwise he
had so commended himself to the favor of his employers
suffering by his crime, that they at all times as well as now
evince a disposition to forgive his abuse of their confidence,
and to support him against the punishment which the law
provides. We find that otherwise than for this crime, his
disposition, character and habits have so strongly com-

mended him to his friends, acquaintances and persons of his faith, that they are unanimous in the belief that the exposure and humiliation of his conviction are a sufficient punishment, and that he can be saved to the good of society if nothing further is done with him."

After further elaborating considerations of a like nature and stating very many circumstances confirming those mentioned, to leave no room for doubt that its action was intended to be permanent and was based alone on the extraneous circumstances stated, the court said:

"Passing now to the concrete case, we observe for the benefit of the United States that nothing exists in this case which moved the court to suspend the execution of sentence to prevent 'an abuse of the court's process, or to prevent an injustice being done to the defendant' so far as it may be said that abstract justice required defendant to suffer for his crime. However, we considered the defendant from many standpoints to be as worthy of the benefit of the discretion to suspend the execution of his sentence as any other convict upon whom that favor has hitherto been bestowed."

Following a written demand which was thereafter made upon the clerk to issue a commitment which was refused by him on the ground that the sentence had been suspended and the further refusal of the judge to direct the clerk to issue such commitment, the United States sought and obtained a rule to show cause why a mandamus should not be awarded directing the judge to vacate the order of suspension, under which the subject is now before us for consideration.

The remedial appropriateness of the writ of mandamus is at the threshold questioned, but we dispose of the subject by a mere reference to adjudged cases conclusively establishing the want of foundation for the contention. *Ex parte Bradley*, 7 Wall. 364; *Life & Fire Insurance Company* v. *Wilson*, 8 Pet. 291; *In re Winn*, 213 U. S.

458; *In re Metropolitan Trust Co.*, 218 U. S. 312; *Ex parte Metropolitan Water Company*, 220 U. S. 539. In addition, however, it is urged that as the right to resort to the extraordinary remedy by mandamus must rest upon the assumption that the order of suspension was absolutely void, therefore the rule for the writ should have been directed not against the judge, but against the clerk to compel him to issue the commitment. But we pass from its consideration, as we are of opinion that its want of merit will be completely demonstrated by the slightest appreciation of the judicial duties of the court below and the ministerial relation of the clerk of the court to the same.

The return to the rule and the statement in support of the same lucidly portray the contentions involved in the question of power to be decided and the subject in all its aspects has been elaborately discussed, not only by the printed arguments of the parties, but in addition light has been thrown on the general question by an argument submitted by the New York State Probation Commission, explaining the statutory system of parole prevailing in that State, and by an able argument presented by members of the Bar of the First Circuit in behalf of a practice of mitigating or pretermitting, when deemed necessary, the statutory punishment for crimes which it is declared has prevailed in the United States courts in that circuit for many years.

The argument on behalf of the respondent concedes that the order of suspension was permanent and absolutely removed the accused from the operation of the punishment provided by the statute; and it is further conceded that a suspension of this character was the equivalent of an absolute and permanent refusal to impose under the statute any sentence whatever. However absolute may be the right thus asserted, it is nevertheless said it is not without limitation, since it may not be capriciously called

into play.   Passing the question whether this assumed restriction is not in the nature of things imaginary as the result of the scope of the authority asserted, let us come to dispose of the contention made by examining the propositions relied upon to sustain it.

They are: 1. That the right to refuse to impose a sentence fixed by statute or to refuse to execute such a sentence when imposed, is a discretion inhering in the judicial power to try and punish violations of the criminal law. 2. That even if there be doubt on this subject as an original proposition, such doubt is dispelled as the right was recognized and frequently exerted at common law.   3. That the power claimed has also been recognized by decisions of state courts and of United States courts of original jurisdiction to such an extent that the doctrine is now to be considered as not open to controversy.   4. That whatever may be the possibility of dispute as to this last view, at least it cannot be denied that in both the state and federal courts, over a very long period of time, the power here asserted has been exercised often with the express, and constantly with the tacit, approval of the administrative officers of the state and federal governments, and has been also tacitly recognized by the inaction of the legislative department during the long time the practice has prevailed, to such an extent that the authority claimed has in practice become a part of the administration of criminal law both state and federal, not subject to be now questioned or overthrown because of mere doubts of the theoretical accuracy of the conceptions upon which it is founded.

1. *The contention as to inherent judicial power.*

Indisputably under our constitutional system the right to try offences against the criminal laws and upon conviction to impose the punishment provided by law is judicial, and it is equally to be conceded that in exerting the powers vested in them on such subject, courts inherently possess

ample right to exercise reasonable, that is, judicial, discretion to enable them to wisely exert their authority. But these concessions afford no ground for the contention as to power here made, since it must rest upon the proposition that the power to enforce begets inherently a discretion to permanently refuse to do so. And the effect of the proposition urged upon the distribution of powers made by the Constitution will become apparent when it is observed that indisputable also is it that the authority to define and fix the punishment for crime is legislative and includes the right in advance to bring within judicial discretion, for the purpose of executing the statute, elements of consideration which would be otherwise beyond the scope of judicial authority, and that the right to relieve from the punishment, fixed by law and ascertained according to the methods by it provided, belongs to the executive department.

The proposition might well be left with the demonstration which results from these considerations, but the disregard of the Constitution which would result from sustaining the proposition is made if possible plainer by considering that, if it be that the plain legislative command fixing a specific punishment for crime is subject to be permanently set aside by an implied judicial power upon considerations extraneous to the legality of the conviction, it would seem necessarily to follow that there could be likewise implied a discretionary authority to permanently refuse to try a criminal charge because of the conclusion that a particular act made criminal by law ought not to be treated as criminal. And thus it would come to pass that the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of the other departments and hence leave no law to be enforced.

2. *The contention as to support for the proposition at common law.*

The common law is thus stated in Hale's Pleas of the Crown, vol. 2, chap. 58, p. 412:

"Reprieves or stays of judgment or execution are of three kinds, viz:

"I. *Ex mandato regis.* . . .

"II. *Ex arbitrio judicis.* Sometimes the judge reprieves before judgment, as where he is not satisfied with the verdict, or the evidence is uncertain, or the indictment insufficient, or doubtful whether within clergy; and sometimes after judgment, if it be a small felony, tho out of clergy, or in order to a pardon or transportation. Crompt. Just. 22, b. and these arbitrary reprieves may be granted or taken off by the justices of gaol-delivery, altho their sessions be adjourned or finished, and this by reason of common usage. Dy. 205 a.

"III. *Ex necessitate legis,* which is in case of pregnancy, where a woman is convict of felony or treason."

Blackstone thus expresses it:

"The only other remaining ways of avoiding the execution of the judgment are by a reprieve or a pardon; whereof the former is temporary only, the latter permanent.

"I. A reprieve, from *reprendre,* to take back, is the withdrawing of a sentence for an interval of time; whereby the execution is suspended. This may be, first, *ex arbitrio judicis;* either before or after judgment; as, where the judge is not satisfied with the verdict, or the evidence is suspicious, or the indictment is insufficient, or he is doubtful whether the offence be within clergy; or sometimes if it be a small felony, or any favourable circumstances appear in the criminal's character, in order to give room to apply to the crown for either an absolute or conditional pardon. These arbitrary reprieves may be granted or taken off by the justices of gaol delivery, although their session be finished, and their commission expired: but this rather by common usage, than of strict right.

"Reprieve may also be *ex necessitate legis:* as, where a woman is capitally convicted, and pleads her pregnancy; though this is no cause to stay the judgment, yet it is to respite the execution till she be delivered. This is a mercy dictated by the law of nature, *in favorem prolis.*" (Book IV, ch. xxxi, pp. 394–395.)

While it may not be doubted under the common law as thus stated that courts possessed and asserted the right to exert judicial discretion in the enforcement of the law to temporarily suspend either the imposition of sentence or its execution when imposed to the end that pardon might be procured or that a violation of law in other respects might be prevented, we are unable to perceive any ground for sustaining the proposition that at common law the courts possessed or claimed the right which is here insisted upon. No elaboration could make this plainer than does the text of the passages quoted. It is true that, owing to the want of power in common law courts to grant new trials and to the absence of a right to review convictions in a higher court, it is we think to be conceded: (a) That both suspensions of sentence and suspensions of the enforcement of sentence, temporary in character, were often resorted to on grounds of error or miscarriage of justice which under our system would be corrected either by new trials or by the exercise of the power to review. (b) That not infrequently, where the suspension either of the imposition of a sentence or of its execution was made for the purpose of enabling a pardon to be sought or bestowed, by a failure to further proceed in the criminal cause in the future, although no pardon had been sought or obtained, the punishment fixed by law was escaped. But neither of these conditions serves to convert the mere exercise of a judicial discretion to temporarily suspend for the accomplishment of a purpose contemplated by law into the existence of an arbitrary judicial power to permanently refuse to enforce the law.

And we can deduce no support for the contrary contention from the rulings in 2 Dyer, 165a, 205a and 235a, since those cases but illustrate the exercise of the conceded, reasonable, discretionary power to reprieve to enable a lawful end to be attained. Nor from the fact that common law courts possessed the power by recognizances to secure good behavior, that is, to enforce the law, do we think any support is afforded for the proposition that those courts possessed the arbitrary discretion to permanently decline to enforce the law. The cases of *Rex* v. *Hart*, 30 How. State Trials, 1344, and *Regina* v. *Dunn*, 12 Q. B. 1026, 1041, certainly do not tend to so establish, since they simply manifest the exertion of the power of the courts after a conviction and the suffering of the legal penalty to exact from the convicted person a bond for his good behavior thereafter.

3. *The support for the power asserted claimed to be derived from the adjudication of state and federal courts.*

Coming first to the state courts, undoubtedly there is conflict in the decisions. The area, however, of conflict will be narrowed by briefly stating and contrasting the cases. We shall do so by referring chronologically to the cases denying the power, and then to those relied upon to establish it.

In 1838 the Supreme Court of North Carolina in *State* v. *Bennett*, 4 Dev. & Battle's Law, 43, was called upon to decide whether a trial court had the right to permanently remit upon condition a part of a criminal sentence fixed by statute. The court said:

"We know that a practice has prevailed to some extent of inflicting fines with the provision that they should be diminished or remitted altogether upon matter thereafter to be done, or shown to the Court by the person convicted. But we can find no authority in law for this practice, and feel ourselves bound, upon this first occasion when it is brought judicially to our notice, to declare it illegal."

In 1860 in *People* v. *Morrisette*, 20 How. Pr. 118, an accused after pleading guilty asked a suspension of sentence and to be then discharged from custody. The court said:

"I am of the opinion the court does not possess the power to suspend sentence indefinitely in any case. As I understand the law, it is the duty of the court, unless application be made for a new trial, or a motion in arrest of judgment be made for some defect in the indictment, to pronounce judgment upon every prisoner convicted of crime by a jury, or who pleads guilty. An indefinite suspension of the sentence prescribed by law is a quasi pardon, provided the prisoner be discharged from imprisonment. No court in the state has any pardoning power. That power is vested exclusively in the governor."

In *People* v. *Brown*, 54 Michigan, 15, in deciding that no power to permanently suspend a sentence existed, speaking through Mr. Chief Justice Cooley, the court said:

"Now it is no doubt competent for a criminal court, after conviction, to stay for a time its sentence; and many good reasons may be suggested for doing so; such as to give opportunity for a motion for a new trial or in arrest, or to enable the judge to better satisfy his own mind what the punishment ought to be: *Commonwealth* v. *Dowdican's Bail*, 115 Mass. 133; but it was not a suspension of judgment of this sort that was requested or desired in this case; it was not a mere postponement; it was not delay for any purpose of better advising the judicial mind what ought to be done; but it was an entire and absolute remission of all penalty and the excusing of all guilt. In other words, what was requested of the judge was that he should take advantage of the fact that he alone was empowered to pass sentence, and, by postponing indefinitely the performance of this duty indirectly but to complete effect grant to the respondent a pardon for his crime."

And, considering the doctrine as to the want of power

thus expounded from the point of view of the common law and of every argument here relied upon, state courts have in the cases which are in the margin in careful opinions denied the existence of the power now claimed.[1]

The cases to the contrary are these, omitting one in a court of original jurisdiction in Massachusetts referred to by counsel but in which there is no written opinion:

In 1874 in *Commonwealth* v. *Dowdican's Bail*, 115 Massachusetts, 133, the right in a criminal case "to lay the case on file" and postpone the sentence was sustained, the court declaring that the practice had long existed, and was recognized by statutes one of which regulated the granting of parole by courts in liquor cases.

---

[1] *People* v. *Kennedy*, 58 Mich. 372 (1885); *Gray* v. *State*, 107 Ind. 177 (1886); *People* v. *Blackburn*, 6 Utah, 347 (1890); *State* v. *Voss*, 80 Ia. 467 (1890); *People ex rel. Benton* v. *Court*, 8 N. Y. Crim. Rep. 355 (1892), affirmed in 66 Hun, 550 (1893); *In re Strickler*, 51 Kans. 700 (1893); *People ex rel. Smith* v. *Allen*, 155 Ill. 61 (1895); *In re Markuson*, 5 N. Dak. 180 (1895); *In re Webb*, 89 Wis. 354 (1895); *United States* v. *Folsom*, 8 N. Mex. 651 (1896); *State* v. *Murphy*, 23 Nev. 390 (1897); *Neal* v. *State*, 104 Ga. 509 (1898); *Hawaii* v. *Pedro*, 11 Haw. 287 (1898); *In re Beck*, 63 Kans. 57 (1901); *Miller* v. *Evans*, 115 Ia. 101 (1901); *People* v. *Barrett*, 202 Ill. 287 (1903); *In re Flint*, 25 Utah, 338 (1903); *State* v. *Dalton*, 109 Tenn. 544 (1902); *Grundel* v. *People*, 33 Colo. 191 (1905); *Tuttle* v. *Lang*, 100 Me. 123 (1905); *McCampbell* v. *State*, 116 Tenn. 98 (1905); *Ex parte St. Hilaire*, 101 Me. 522 (1906); *Tanner* v. *Wiggins*, 54 Fla. 203 (1907); *State* v. *Hockett*, 129 Mo. App. 639 (1908); *Ex parte Clendenning*, 22 Okla. 108 (1908); *Ex parte Cornwall*, 223 Mo. 259 (1909); *Wall* v. *Jones*, 135 Ga. 425 (1910); *State* v. *Smith*, 173 Ind. 388 (1910); *State ex rel. Cary* v. *Langum*, 112 Minn. 121 (1910); *Ex parte Peterson*, 19 Ida. 433 (1911); *State* v. *Abbott*, 87 S. Car. 466 (1911); *Spencer* v. *State*, 125 Tenn. 64 (1911); *State* v. *Sapp*, 87 Kans. 740 (1912); *Daniel* v. *Persons*, 137 Ga. 826 (1912); *State* v. *Sturgis*, 110 Me. 96 (1912); *State* v. *Talberth*, 109 Me. 575 (1912); *Fuller* v. *State*, 100 Miss. 811 (1911); *Ex parte Bugg*, 163 Mo. App. 44 (1912); *Snodgrass* v. *State*, 150 S. W. (Texas) 162 (1912); *Roberts* v. *Wansley*, 137 Ga. 439 (1912); *Hancock* v. *Rogers*, 140 Ga. 688 (1913); *Brabandt* v. *Commonwealth*, 157 Ky. 130 (1914); *Ex parte Hart*, 29 N. Dak. 38 (1914); *Reese* v. *Olsen*, 44 Utah, 318 (1914).

The case just cited was approvingly referred to in *Sylvester* v. *State*, 65 N. H. 193, and declared to express the practice long prevailing in New Hampshire.

In 1894, in *People ex rel. Forsyth* v. *Court of Sessions*, 141 N. Y. 288, in holding that a trial court had power to permanently suspend a sentence for reasons dehors the legality of the conviction, it was declared that such power existed at common law and hence prevailed in the State, this being supported by a quotation from Hale's Pleas of the Crown. In addition it was said, referring to a state parole statute enacted subsequent to the conviction, that such statute, while it conferred no new or other power than that possessed at common law, nevertheless.imposed the duty to see to it that the power was not lost to impose future punishment after the release if the condition of suspension was violated.

In the cases cited in the margin the power was upheld upon the rulings in *Commonwealth* v. *Dowdican's Bail,* *supra*, and the *Forsythe Case*, *supra*, or because of a practice long prevailing.[1]

Leaving aside the question of the asserted duty to sustain the doctrine because of the long established prac-

---

[1] *State* v. *Addy*, 43 N. J. L. 113 (1881); *People* v. *Mueller*, 15 Chicago Legal News, 364 (1883); *Commonwealth* v. *Maloney*, 145 Mass. 205 (1887); *Ex parte Williams*, 26 Fla. 310 (1890); *State* v. *Crook*, 115 N. Car. 760 (1894); *State* v. *Whitt*, 117 N. Car. 804 (1895); *People ex rel. Dunnigan* v. *Webster*, 14 Misc. (N. Y.) 617 (1895); *Weber* v. *State*, 58 Ohio St. 616 (1898); *Shaefer* v. *Ohio*, 7 Ohio Cir. Ct. (N. S.) 292 (1905); *In re Clara Lee*, 3 Ohio N. P. (N. S.) 533 (1905); *State* v. *Hilton*, 151 N. Car. 687 (1909); *State* v. *Drew*, 75 N. H. 402 (1909); *State* v. *Drew*, 75 N. H. 604 (1910); *Ex parte Hinson*, 156 N. Car. 250 (1911); *Gehrmann* v. *Osborne*, *Warden*, 79 N. J. Eq. 430 (1911) *People* v. *Goodrich*, 149 N. Y. Supp. 406 (1914); *State* v. *Tripp*, 168 N. Car. 150 (1914); *State* v. *Johnson*, 169 N. Car. 311 (1915). See *Green* v. *State*, 88 Ark. 290 (1908); *Joiner* v. *State*, 94 Ark. 198 (1910); *People* v. *Patrich*, 118 Cal. 332 (1897); *Commonwealth* v. *Nuber*, 6 Pa. Super. Ct. Rep. 420 (1898); *Commonwealth* v. *Dunleavy*, 16 Pa. Super. Ct. Rep. 380 (1901).

tice, which we shall hereafter consider, we think it clear that the long and settled line of authority to which we have previously referred denying the existence of the power is in no way weakened by the rulings which lie at the basis of the cases relied upon to the contrary. In the first place, on the face of the opinion in *Commonwealth v. Dowdican's Bail, supra,* it would seem certain that that case treated the power as being brought by the state legislation which was referred to within the domain of reasonable discretion, since by the effect of that legislation the right to exert such power, if not directly authorized, was at least by essential implication sanctioned by the state law. In the second place, in so far as the *Forsyth Case, supra,* is concerned and its declaration as to what was the common law upon the subject, the error thus fallen into is not only demonstrated by what we have said as to the common law, but is additionally shown by the fact that the quotation from Hale's Pleas of the Crown made in the opinion contains clauses supporting the opinion expressed as to the common law when in fact the clauses in question, it would seem, were by some error of citation mistakenly attributed to Hale. We say this because the clauses referred to and attributed to Hale in the quotation are not found in any edition of the Pleas of the Crown which we have been able to examine, and it is stated by counsel for the United States that after diligent search no passage containing the clauses has been discovered, and the existence of any edition of the work containing them is not pointed out by opposing counsel. But whether this be well founded or not, as the conclusion concerning the common law which the case expressed is we think obviously unsound, we are unable on the authority of such a mistaken view to disregard the long established and sound rule laid down in the many state cases which we have quoted.

So far as the courts of the United States are concerned,

it suffices to say that we have been referred to no opinion maintaining the asserted power, and on the contrary in the opinion in the only case in which the subject was considered it was expressly decided the power was wanting. *United States* v. *Wilson*, 46 Fed. Rep. 748 (1891). It is true that in the District of Columbia the existence of the power was maintained. *Miller* v. *United States*, 41 App. D. C. 52 (1913). But the unsoundness of the grounds upon which the conclusion was based is demonstrated by what we have previously said; and aside from this, as the subject was covered by an Act of Congress conferring power of parole (Act of July 25, 1910, 36 Stat. 864), the case requires no further consideration.

4. *The duty to recognize the power as lawful because of its exertion in practice by the state and federal courts and the implications arising therefrom.*

There is no doubt that in some States, without reference to probation legislation or an affirmative recognition of any doctrine supporting the power, it was originally exerted and the right to continue to do so came to be recognized solely as the result of the prior practice. *Gehrmann* v. *Osborne, Warden,* 79 N. J. Eq. 430.

As to the courts of the United States, in one of the circuits, the first, especially in the Massachusetts district, it is admitted the practice has in substance existed for probably sixty years as the result of a system styled "laying the case on file." The origin of this system is not explained, but it is stated in the brief supporting the practice that courts of the United States have considered the existing state laws as to probation and have endeavored in a certain manner to conform their action thereto. It is true also, that in the courts of the United States, sometimes in one or more districts in a circuit and sometimes in other circuits, in many instances the power here asserted was exerted, it would seem without any question, there being no objection raised by the representatives of

the United States; indeed it is said that in Ohio where the power, as we have seen, was recognized as existing, it was exerted by Mr. Justice Matthews of this court when sitting at circuit, and there and elsewhere, it is pointed out, the power was also exerted in some instances by other judges then or subsequently members of this court. But yet it is also true that, numerous as are the instances of the exertion of the power, the practice was by no means universal, many United States judges, even in a district where the power had been exerted, on a change of incumbency persistently refusing to exert the power on the ground that it was not possessed. Indeed so far was this the case that we think it may be said that the exertion of the power under the circumstances stated was intermittent and was not universal but partial.

As amply shown by the case before us, we think also it is apparent that the situation thus described was brought about by the scrupulous desire of judges not to abuse their undoubted discretion as to granting new trials, and yet to provide a remedy for conditions in cases where a remedy was called for in the interest of the administration of the criminal law itself, as well as by the most obvious considerations of humanity and public well-being,—conditions arising in the nature of things from the state of proof in cases coming before them which could not possibly have been foreseen and taken into consideration by the law-making mind in fixing in advance the penalty to be imposed for a particular crime. And the force of this conclusion will become more manifest by considering that nowhere except sporadically was any objection made to the practice by the prosecuting officers of the United States, who indeed it is said not infrequently invoked its exercise. Albeit this is the case, we can see no reason for saying that we may now hold that the right exists to continue a practice which is inconsistent with the Constitution, since its exercise in the very nature of things

amounts to a refusal by the judicial power to perform a duty resting upon it and, as a consequence thereof, to an interference with both the legislative and executive authority as fixed by the Constitution. The fact that it is said in argument that many persons, exceeding two thousand, are now at large who otherwise would be imprisoned as the result of the exertion of the power in the past, and that misery and anguish and miscarriage of justice may come to many innocent persons by now declaring the practice illegal, presents a grave situation. But we are admonished that no authority exists to cure wrongs resulting from a violation of the Constitution in the past, however meritorious may have been the motive giving rise to it, by sanctioning a disregard of that instrument in the future. On the contrary, so far as wrong resulting from an attempt to do away with the consequences of the mistaken exercise of the power in the past is concerned, complete remedy may be afforded by the exertion of the pardoning power; and so far as the future is concerned, that is, the causing of the imposition of penalties as fixed to be subject, by probation legislation or such other means as the legislative mind may devise, to such judicial discretion as may be adequate to enable courts to meet by the exercise of an enlarged but wise discretion the infinite variations which may be presented to them for judgment, recourse must be had to Congress whose legislative power on the subject is in the very nature of things adequately complete.

While the conclusions just stated inevitably exact that the rule which is before us be made absolute and that the mandamus issue, nevertheless we are of opinion that the exceptional conditions which we have described require that we exercise that reasonable discretion with which we are vested to temporarily suspend the issue of the writ, so as to afford ample time for executive clemency or such other action as may be required to meet the sit-

uation. And for this purpose the issue of the writ will be stayed until the end of this term, unless the United States otherwise requests, when it will go as a matter of course.

*Rule made absolute.*