Petitioner, Gary Bray, has brought an original action in habeas corpus in this court. Petitioner challenges his confinement under Ohio's new "bad time" provisions which were enacted as part of S.B. 2, effective July 1, 1996. Petitioner contends that his confinement for a bad time violation after the expiration of his stated sentence violates various constitutional provisions, particularly his right to due process of law, equal protection, and the doctrine of separation of powers.
Petitioner pled no contest and was found guilty of drug possession in violation of R.C. 2925.11, a felony of the fifth degree. He was sentenced on November 10, 1997 to a term of eight months. Because his offense occurred after July 1, 1996 petitioner was subject to R.C. 2967.11 which in part provides:
 (A) `violation' means an act that is a criminal offense under the law of this state or the United States, whether or not a person is prosecuted for the commission of the offense.
 (B) As part of a prisoner's sentence, the parole board may punish a violation committed by the prisoner by extending the prisoner's stated prison term for a period of thirty, sixty, or ninety days in accordance with this section. The parole board may not extend a prisoner's stated prison term for a period longer than one-half of the state prison term's duration for all violations occurring during the course of the prisoner's stated prison term * * *. If a prisoner's stated prison term is extended under this section, the time by which it is so extended shall be referred to as "bad time." (Emphasis added.)
According to pertinent legislative history of S.B. 2, Ohio eliminated "virtually automatic" good time as inconsistent with the philosophy of "honest sentencing." A Plan for Felony Sentencing in Ohio: A Formal Report of the Ohio Criminal Sentencing Commission (July 1, 1993) (hereinafter "Plan for Felony Sentencing"). Bad time was designed as an alternative disciplinary tool, to provide the Department of Rehabilitation and Correction with a range of sanctions. Id. As emphasized above, the legislature provided that any bad time imposed is to be considered part of the prisoner's original sentence. All prisoners subject to bad time are informed that their stated sentence is subject to such extensions. R.C. 2929.19 provides in pertinent part:
 [I]f the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:
(a) impose a stated prison term;
 (b) notify the offender that the parole board may extend the stated prison term if the offender commits any criminal offense under the laws of this state or the United States while serving the prison term, that the extension will be done administratively as part of the offender's sentence in accordance with section 2967.11 of the Revised Code and may be for thirty, sixty, or ninety days for each violation, that all extensions of any stated prison term for all violations during the course of the term may not exceed one-half of the term's duration, and that the sentence so imposed automatically includes any extension of the stated prison term by the parole board (emphasis added).
Although petitioner's sentencing is not part of this record, we may presume that he was informed by the trial court that his sentence was subject to the bad time provisions. State ex rel. Tillimon v. Weiher (1992), 65 Ohio St.3d 468.
Sections (C), (D), and (E) of R.C. 2967.11 outline the procedures to be followed by the Department of Rehabilitation and Correction and the parole board in imposing bad time. The Department of Rehabilitation and Correction was instructed in R.C. 2967.11(H) to "adopt rules establishing standards and procedures for implementing [bad time]." These regulations, found at Ohio Adm. Code 5120-9-091, are quite detailed and will be discussed more fully infra. Briefly, the statutory provisions require a preliminary investigation of an alleged bad time offense, followed, if warranted, by a hearing in front of a rules infraction board. At the hearing, the accused prisoner has the right to testify and the right to assistance by a member of the staff of the institution. R.C. 2967.11(C). If the rules infraction board determines that there is evidence of a bad time violation, it reports that finding to the head of the institution ("warden") along with a recommendation for the amount of time by which the prisoner's stated term should be extended.
The warden then reviews the board's findings and recommendations. R.C. 2967.11(D). If the warden "determines by clear and convincing evidence that the prisoner committed a violation," he reports that finding to the parole board. Id. The parole board then reviews the findings of both the rules infraction board and the warden:
 If the parole board determines that there is clear and convincing evidence that the prisoner committed the violation and that the prisoner's stated prison term should be extended, the board shall consider the nature of the violation, other conduct of the prisoner while in prison, and any other evidence relevant to maintaining order in the institution. After considering these factors, the board shall extend the stated prison term by either fifteen, thirty, sixty, or ninety days for the violation.[1]
R.C. 2967.11(E).
Petitioner has challenged the bad time provisions on their face, not as they were applied to him. However, we briefly recite the procedural facts of his case. On December 29, 1997, a hearing of the Bad Time Panel of the Rules Infraction Board at Lebanon Correctional Institution was held. The panel found that petitioner had committed a Class II violation associated with R.C. 2903.13 (assault). Petitioner has attached the January 6, 1998 decision of the managing officer ("warden") on bad time review to his petition. The warden found that the decision of the rules infraction panel in regard to the violation was supported by at least some evidence. Under comments, the warden noted "inmate's statement confirms both verbal and physical confrontation." The warden also found clear and convincing evidence that petitioner had committed a bad time violation. The warden determined that a period of bad time was appropriate and recommended that the parole board impose a period of bad time in the amount of ninety days. In making that recommendation, the warden stated that he had considered the "assaultive nature of this offense involving the attempted use of a weapon (cane)."
Petitioner's Exhibit C is the "Determination of Bad Time by the Ohio Parole Board," dated January 30, 1998, imposing 90 days bad time. It states in part:
 Following review of the findings and report of the warden * * * the Ohio Parole Board has determined that there is clear and convincing evidence that the inmate committed a rule violation for which Bad Time may be imposed. In making this determination, the Parole Board considered:
 use of weapon, extent of physical injury, extent of threat to security or orderly operation of institution, extent of threat to safety of any individual, extent to which the violation reflected organized criminal activity, extent of property damage caused by the inmate, other relevant factors.[2]
Petitioner asserts that his confinement due to the bad time determination outlined above is unconstitutional. He maintains that he should have been guaranteed the full panoply of rights attendant on any criminal proceeding, including, but not limited to, the right to a public jury trial, right to the proof beyond a reasonable doubt standard, right to counsel, and rights of confrontation and cross-examination. He argues that without these guarantees his right to the due process of law was violated. Petitioner also alleges that R.C. 2967.11 violates his right to equal protection of the laws and the doctrine of separation of powers. He argues that the state has the burden of proving that R.C. 2967.11 is constitutional and that burden has not been met.
The state responds that prison regulations are entitled to review under a deferential rational basis standard. The state asserts that the legislature had a rational basis for enacting bad time, i.e., to preserve discipline in the prisons. Therefore, the state maintains that the bad time provisions are constitutional.
Before turning to the merits of petitioner's claims, we note that the state has moved to dismiss this habeas corpus petition. The state contends that because petitioner has been released, his claim is now moot. We agree that as to petitioner, this case is moot. However, although a case may be moot, a court may decide the issues raised where they are capable of repetition, yet evading review. State ex rel. Fenley v. Kyger (1995), 72 Ohio St.3d 164. Additionally, the Ohio Supreme Court has held that a habeas corpus action should not be dismissed as moot where the issue is a matter of public importance. Adkins v. McFaul (1996)76 Ohio St.3d 350. In Adkins, the court determined that county jail inmates were not entitled to good time credit equivalent to that received for confinement in a state correctional institution. Although the issue was moot as to the named petitioner, the court held that the issue was a matter of public importance. Id. The court further noted that given the relatively brief sentences involved, the issue was capable of repetition yet could evade review by the court. Id. The issues raised by the petitioner here are arguably even more important as they affect a potentially larger group of prisoners and for potentially longer periods of confinement. We therefore address the merits of petitioner's claims.
We begin our analysis with the principle that all legislative enactments enjoy a strong presumption of constitutionality. State v. Thompkins (1996), 75 Ohio St.3d 558; State ex rel. Dickman v. Defenbecher (1955), 164 Ohio St. 142, paragraph one of the syllabus. The presumption of the validity of legislative enactments cannot be overcome unless it appears that there is a clear conflict between the legislation in question and some particular provision or provisions of the constitution. Xenia v. Schmidt (1920), 101 Ohio St. 437. Moreover, legislation will not be invalidated unless the challenger establishes that it is unconstitutional beyond a reasonable doubt. Thompkins,75 Ohio St.3d at 560.
In statutes affecting criminal sentences the presumption of constitutionality has even more force:
 Pursuant to its police powers, the General Assembly has the authority to enact laws defining criminal conduct and to prescribe its punishment * * * [L]aws passed by virtue of the police power will be upheld if they bear a real and substantial relation to the object sought to be obtained, namely the health, safety, or general welfare of the public, and are not arbitrary, discriminatory, capricious or unreasonable. The federal test is similar. To determine whether such statutes are constitutional under federal scrutiny, we must decide if there is a rational relationship between the statute and its purpose.
Id. (citations omitted.) With these standards in mind we address petitioner's various constitutional claims.
 DUE PROCESS OF LAW
Before determining what due process protections may be constitutionally required, we examine just what interest petitioner seeks to protect. The United States Supreme Court has often noted that "consideration of what procedures due process may require must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected." Morrissey v. Brewer (1972), 408 U.S. 471,481 (citation omitted). In Morrissey, the Court also noted that "not all situations calling for procedural safeguards call for the same kind of procedure." Id. The Supreme Court has not addressed the precise issue presented here, extension of a prisoner's stated and otherwise determinate prison term for criminal conduct committed while in prison.
We will assume, arguendo, that a prisoner's interest in release at the end of his stated prison term is a type of liberty interest. However, that liberty interest was, as part of his sentence, expressly made subject to conditional bad time. A sentence which is partially determinate and partially indeterminate is not on that basis unconstitutional. In reviewing state sentencing practices, the United States Supreme Court has held that, subject only to highly deferential proportionality analysis, "reviewing courts should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." Solem v. Helm (1983), 463 U.S. 277, 290 (emphasis added). The Court has eschewed any presumption in favor of a particular type of sentencing scheme, observing that "penologists themselves have been unable to agree whether sentences should be light or heavy, discretionary or determinate." Rummel v. Estelle (1980),445 U.S. 263, 270.
We have reviewed the Supreme Court's examination of conditional liberty interests in a variety of contexts. In the prison context particularly, the Court has been careful to examine both the asserted liberty interest of the prisoner and the institutional needs of the prison authorities. For instance, in Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (1979), 442 U.S. 1, the Court concluded that only minimal due process rights of notice and an opportunity to be heard were necessary before parole denials. In Sandin v. Conner (1995),115 S.Ct. 2293, the Court held that no procedural protections were necessary before prisoners could be disciplined by solitary confinement. The Court noted that discipline by prison officials in response to a wide range of misconduct effectuates prison management and rehabilitative goals and "falls within the expected parameters of the sentence imposed by a court of law." Id. at 2301.
In contrast, in Morrissey v. Brewer (1972), 408 U.S. 471, 481, the Supreme Court held that revocation of parole, although concededly implicating only conditional liberty, nevertheless involved a "grievous loss." Therefore, the Court held that considerably greater due process protections were required than for denial of parole or discipline within the prison setting. These procedures include a preliminary probable cause hearing as well as a final hearing. At the final hearing the parolee is entitled to written notice of the claimed violation; disclosure of the evidence against him; an opportunity to be heard and to present witnesses and documentary evidence; the right to confrontation and cross-examination, unless denied for good cause; a neutral and detached hearing body; and a written statement by the fact-finders. Id. The Supreme Court stressed that although these due process protections were required, the proceedings were not equivalent to a criminal prosecution in any sense. Id. at 486. The Court later determined that a limited right to counsel also attaches to parole revocation proceedings. Gagnon v. Scarpelli (1973), 411 U.S. 778.
An intermediate level of procedural protections has been provided by the Court for revocation of good time credits. In Wolff v. McDonnell (1974), 418 U.S. 539, the Court held that a statutory provision for mandatory sentence reductions ("good time") created a liberty interest in a shortened prison sentence. The Court articulated minimum procedures necessary to reach a "mutual accommodation between institution needs and objectives and the provisions of the Constitution." Id. at 556. The protections required by the Court were less than those for parole revocation but more than those for parole denial or solitary confinement.
We conclude that petitioner's interest in release at the end of his stated sentence without "bad time" is substantially equivalent to the prisoners' interest in sentences shortened with "good time" as analyzed in Wolff. We reach this conclusion by examining how good time operates in practice, both in Ohio and in the state schemes which the Supreme Court has reviewed.
Under Ohio's previous sentencing scheme, sentences were determinate or indeterminate. Generally, for felonies other than aggravated murder or murder, offenders were imprisoned for an indefinite term of imprisonment. Each degree of felony carried an indeterminate penitentiary or reformatory sentence consisting of a minimum term fixed by the trial court from among four choices provided by statute, and a maximum term fixed by the statute, and otherwise subject to the parole board's discretion. Plan for Felony Sentencing at 9.
This sentencing scheme operated to place a good deal of discretion in the hands of the parole authorities. Some discretion over the actual length of a prisoner's confinement was also placed in the hands of the prison authorities due to their ability to impose reductions in "good time." Good time was codified at R.C. 2967.19 and was repealed by S.B. 2, effective July 1, 1996.
This court has previously explained just how the "good time" system impacted the length of sentences.
 When inmates are admitted to the Ohio corrections system, an end-of-sentence date is calculated taking into account good time that can be earned during the course of confinement. R.C. 2967.19(E) permits prospective deductions of good time, but does not allow deduction of good time previously earned. Accordingly, the only available method to penalize inmates with loss of good time is to deduct good time previously credited that would otherwise have been earned in the future by adding days to the end-of-sentence date previously determined. (Emphasis added).
State ex rel. Lewis v. Madison Correctional Institution (July 10, 1995), Madison App. No 94-11-043, unreported. In Lewis, for example, the penalty for a rules infraction was "12 months good time due to nature of charge," meaning that the petitioner was rendered unable to earn good time for twelve months. The penalty was imposed by "adding one hundred fifty-six days `lost good time' to his sentence." Id. (emphasis added).
The Supreme Court has consistently evaluated good time (or "gain time") provisions with the realistic acknowledgment that good time often affects not merely the discretionary date of parole eligibility but the actual date on which a prisoner must otherwise be released. For instance, in McGinnis v. Royster (1972), 410 U.S. 263, the Supreme Court reviewed New York's complex sentencing system. The Court noted that jail time denoted time an individual passed in county jail prior to sentencing, and good time was awarded for good behavior and efficient performance of duties during incarceration. The Court noted that good time affected the calculation of the statutory release date, which was the earliest date a prisoner must be paroled.[3]
The Supreme Court has consistently acknowledged that good time has a significant impact on sentences. In a recent ruling on enactments which affect sentences, the Court held that a legislature cannot change its provisions affecting good time or gain time or even overcrowding time without violating the Ex Post Facto Clause. Lynce v. Mathis (1997), U.S., 117 S.Ct. 891. This holding was premised upon the fact that gain time was "part of the sentence" even though it "bears no relationship to the original penalty assigned the crime." In considering changes to gain time or good time schemes, the Supreme Court considers not the subjective motivation of the legislature, but whether the statute "lengthens the period that someone in petitioner's position must spend in prison." Weaver v. Graham (1981),450 U.S. 24, 33 (emphasis added).
As noted above, in specifically determining what due process protections attach to a loss of good time decision, the Supreme Court first held that there was a substantial liberty interest involved and then balanced that interest against the prison's need for discipline. In Wolff, Nebraska prisoners challenged prison officials' decision to revoke good time credits as a disciplinary measure. 418 U.S. at 543. Inmates earned good time credits under a state statute that provided mandatory sentence reductions for good behavior, revocable only for "flagrant or serious misconduct." Id. at 546. The court later noted that "[w]here a prisoner has a liberty interest in good time credits, the loss of such credits threatens his prospective freedom from confinement by extending the length of imprisonment." Superintendent, Mass. Corr. Institution v. Hill (1985),472 U.S. 445, 454 (emphasis added).
Wolff held that:
 Where a prison disciplinary hearing may result in the loss of good time credits * * * the inmate must receive (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.
Id. (citing 418 U.S. at 563-567).
In Hill, the Court added one further requirement, that the finding of the prison disciplinary board be supported by "some evidence in the record." 472 U.S. at 455. The Court noted that the inmates' "strong interest" must be accommodated in the "distinctive setting of a prison, where disciplinary proceedings `take place in a closed tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so.'" Id. at 456 (citing418 U.S. at 561). The Court in Hill specifically held that "revocation of good time credits is not comparable to a criminal conviction" and declined to impose the due process requirements of a criminal conviction in the different and "highly charged" institutional setting. Id.
We find that the Wolff/Hill protections are applicable to the imposition of bad time. We hold that imposition of bad time requires protections equivalent to those applicable to the loss of good time for two important reasons: First, both the loss of good time and the imposition of bad time extend the period of imprisonment. Second, for either sanction, the decision and whatever procedures are required must take place inside the institutional setting.
Having determined that the protections constitutionally attendant on the reduction of good time are appropriate, our remaining task is to determine whether the bad time provisions meet those guidelines. We conclude that they do.
Wolff's first requirement is advance written notice of the disciplinary charges. 418 U.S. at 563. The regulations of the Department of Rehabilitation and Correction concerning bad time are set forth at Ohio Adm. Code 5120-9-091. The regulations provide for pre-rules infraction board procedure; rules infraction board procedure; review by the warden; and consideration by the parole board. 5120-9-091(B) specifies that the pre-rules infraction board procedure includes review of a conduct report charging a bad time violation by an institutional investigator. Once a conduct report charging a bad time violation has been approved by this officer a copy of the conduct report is to be given to the accused by the hearing officer. Id. The duties of the hearing officer and the procedures that officer is to follow are set forth in Ohio Adm. Code 5120-9-07. Hearings before the bad time panel of the rules infraction board are to be held in accordance with Ohio Adm. Code 5120-9-09. That regulation includes a requirement that:
 No inmate shall appear before the rules infraction board sooner than twenty-four hours following the receipt by the inmate of the written conduct report as approved by the administrative review officer, unless the inmate, by a free and voluntary waiver, desires a hearing in a shorter period of time,
Therefore, Wolff's first requirement of advance written notice of the charges is met.
Wolff's second requirement is the opportunity to call witnesses and present documentary evidence. 418 U.S. at 566. Ohio Adm. Code 5120-9-091 provides that inmates "shall have a right to be present, to call witnesses, and to have the assistance of a staff member in presenting their defense." Ohio Adm. Code 5120-9-09
provides in part:
 (D) The inmate may, at the discretion of the chairman of the rules infraction board, call a reasonable number of witnesses, including inmates, to testify and to present documentary evidence. The request shall not be unreasonably denied.
We find that Wolff's second requirement is satisfied by these regulations.
Wolff's final requirement is a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action. 418 U.S. at 565. Ohio Adm. Code 5120-9-091 (C)(5) provides that:
 The panel shall advise the inmate of their determination and the procedure for appeal and review of their decision. The panel shall make written findings briefly stating the evidence relied upon and the basis for any disposition made by them, including a recommendation for bad time.
Thus, Wolff's final requirement is also met.
In Hill, the Supreme Court added the requirement that the decision of the prison disciplinary board be supported by "some evidence." 472 U.S. at 455. The Court noted that:
 ascertaining whether this standard is satisfied would not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.
Id.
The bad time regulations provide that the panel of the rules infraction board is to make several determinations, including whether there is at least some evidence that the accused inmate has committed a rule violation; whether there is at least some evidence that the accused inmate has committed a bad time violation; and whether the evidence of a bad time violation amounts to clear and convincing evidence. Ohio Adm. Code 5120-9-091(C)(3)(a), (b), and (c). Additionally, no inmate shall be found to have violated a rule unless the finding is based on some evidence which may include circumstantial evidence, considering the record as a whole. Ohio Adm. Code 5120-9-09. The warden also reviews the record and conducts an interview with the inmate. Ohio Adm. Code 5120-9-091(D)(1). The warden's review is an intermediate step between the rules infraction panel and the parole board. If the warden finds that the decision is supported by at least some evidence, but the evidence does not meet the clear and convincing standard, then the warden shall terminate further consideration of bad time. Ohio Adm. Code 5120-9-091(D)(3)(b). If the warden finds the evidence is clear and convincing then the warden may recommend a period of bad time. Ohio Adm. Code 5120-9-091(D)(3)(c). The parole board's review is also based on a clear and convincing standard. Ohio Adm. Code 5120-9-091(E)(3).
We find that these regulations sufficiently require that the decision to impose bad time be supported by at least some evidence as mandated by Hill. Therefore, the final due process requirement has been met. We hold that bad time is constitutional under the appropriate due process analysis.
 EQUAL PROTECTION
Petitioner also maintains that with bad time "prisoners face a different kind of criminal prosecution that undeniably impinges upon fundamental rights, [therefore] a strict scrutiny analysis must be employed." The standard for determining if a statute violates equal protection is similar under state and federal law. State v. Thompkins (1996), 75 Ohio St.3d 558, 561. Our decision that bad time is part of the original sentence, as the legislature intended, disposes of this claim as well. The fact that prisoners do not receive the full panoply of rights afforded those accused of crimes is no more an equal protection violation than it is a due process one. There is a fundamental difference between normal society and prison society. Rules designed to govern those functioning in a free society cannot automatically be applied to the very different situation presented in a prison. Prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply. Wolff, 418 U.S. at 556.
All prisoners are treated equally under the bad time provisions, therefore the only classification is between prisoners who have been convicted and sentenced for a crime and those who commit an offense while not under a sentence. See, e.g., State v. Thompkins (1996), 75 Ohio St.3d 558 (laws designed to punish offenders do not violate equal protection).
Similarly, there is no equal protection violation where a parole revocation results in more imprisonment than the same offense would have earned if tried on a separate criminal charge. See United States ex rel. Viotratos v. Campbell (N.D.Ohio 1976),410 F. Supp. 1208.
Furthermore, in Turner v. Saffley (1978), 482 U.S. 78, and Washington v. Harper (1990), 494 U.S. 210, the Supreme Court has held that even when fundamental constitutional rights are at stake, strict scrutiny or the compelling state interest is not applicable in the prison setting.
Under rational basis scrutiny, legislative distinctions are invalid only if they bear no relation to the state's goals and no ground can be conceived to justify them. Thompkins,75 Ohio St.3d at 560. The legislature had a rational basis for implementing bad time. Once good time was eliminated from the sentencing scheme, prison authorities reasonably required another disciplinary tool. Accordingly, we hold that bad time does not violate the equal protection provisions of the Ohio or United States Constitutions.
 SEPARATION OF POWERS
Finally, petitioner argues that bad time violates the doctrine of separation of powers. This argument is again implicitly premised on his alleged entitlement to the full panoply of rights granted in an original criminal action. He argues that only judges, juries, and courts can sentence for crimes. Had the Department of Rehabilitation and Corrections unilaterally attempted to implement its own quasi-judicial system for punishing offenses with additional prison time, this argument would have considerable force. However, as explained above, the legislature decided to implement bad time as part of its inherent authority to define crimes and specify punishments. The legislature has enacted many sentencing alternatives to imprisonment, including the range of community control sanctions listed at R.C. 2929.15. The legislature has also indicated that all those convicted of certain felonies must be subject to post-release control, eliminating much of the discretion formally enjoyed by parole authorities. See R.C. 2967.28. The legislature has also provided that, with certain procedural safeguards, those offenders who have received prison sentences for their crimes may have their stated sentences extended through imposition of bad time. R.C. 2967.11. In implementing these provisions, the Department of Rehabilitation and Correction and the parole board are acting pursuant to legislatively delegated sentencing powers. We do not find that this is an improper usurpation of judicial power.
The Ohio Supreme Court has held that the administration of justice by the judicial branch of the government cannot be impeded by the other branches of the government in the exercise of their respective powers. State v. Hochhausler (1996), 76 Ohio St.3d 455. Bad time, however, does not impede the judicial branch. The legislature has determined that bad time is prospectively part of the sentence whenever the offender is to be imprisoned. The power of judges to sentence is granted by the legislature and can be circumscribed by the legislature. See State ex rel. Gordon v. Zangerle (1940), 136 Ohio St. 371; Cleveland v. Scott (1983), 8 Ohio App.3d 358. The United States Supreme Court has also held that the authority to define and fix the punishment for a crime belongs indisputably to the legislature. Ex Parte United States (1916), 242 U.S. 27.
In the only other opinion on the merits of bad time, Judge O'Neill in dissent has argued that bad time's "in-house court system" violates the doctrine of separation of powers. State v. Spikes (Sept. 8, 1998), Lake Co. App. No. 97-L-158, unreported, (O'Neill, J., dissenting).[4] Judge O'Neill maintains that bad time is at odds with Article IV, Section I of the Ohio Constitution which provides:
 The judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas, and division thereof, and such other courts inferior to the supreme court as may from time to time be established by law.
However, this provision has not been violated where, as here, no judicial power has been usurped. Administrative hearing officers are empowered to decide a broad variety of issues. In Morrissey, for instance, the Supreme Court specifically held that for revocation of parole, although there must be both a preliminary and a final hearing, neither hearing must be before a judicial officer. All that is constitutionally required is a "`neutral and detached hearing body' such as a traditional parole board." 405 U.S. at 489. Such a hearing officer indisputably has the power to return the parole violator to prison, yet no separation of powers problem is presented because such a possible disposition was within the sentence originally imposed. Similarly, the possible addition of bad time is within the sentence imposed on all prison-bound offenders. With the due process protections found applicable above, such a sentence is within the legislature's police power and does not violate the doctrine of the separation of powers. Therefore, petitioner's final argument against bad time is not well-taken.
Petition denied.
YOUNG, P.J., and POWELL, J., concur.
[1] The parole board may not extend a prisoner's stated prison term for a period longer than one-half of the prisoner's stated prison term for all violations. R.C. 2967.11(B).
[2] These factors are from a list on the preprinted form. The only factors which were not checked were: committed during an escape or attempted escape from custody; violation was part of a calculated plan or scheme; and the disciplinary record of the accused inmate. These listed factors are the factors which the rules infraction board is required to consider in making a recommendation for the imposition of bad time pursuant to Ohio Adm. Code 5120-9-091(C)(4). The warden and parole board are also instructed to consider these factors in their review of the record. See Ohio Adm. Code 5120-9-091(D)(2)(g) and (E)(3).
[3] The Court found that a classification scheme which denied good time credit for jail time in computing the minimum parole date while allowing it in calculating the statutory release date was not violative of equal protection.
[4] In Spikes, the Eleventh District Court of Appeals held that the appellant did not have standing to challenge bad time on direct appeal as no bad time had yet been imposed.