**UNITED STATES**

v.

**Stephen J. FLEMMI**

**No. CR.A. 99–10371–RGS.**

United States District Court,
D. Massachusetts.

Sept. 18, 2003.

---

See also 195 F.Supp.2d 243.

Brian T. Kelly, United States Attorney's Office, Colin G. Owyang, United States Attorney's Office, Fred M. Wyshak, Jr., United States Attorney's Office, Boston, MA, for Plaintiff.

Page Kelley, Federal Defender's Office, Charles P. McGinty, Federal Defender's Office, Boston, MA, Judith H. Mizner, Newburyport, MA, for Defendant.

Christopher T. Meier, Sloane and Walsh, LLP, Boston, MA, for Michael J. Donahue, Interested Party.

Edward T. Hinchey, Sloane & Walsh, Boston, MA, for Michael J. Donahue, Movant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS ON GROUNDS OF RES JUDICATA

STEARNS, District Judge.

Defendant Stephen Flemmi has been the subject of a running series of indictments highlighting a criminal career that has, by admission or allegation, run the gamut of the offenses typically associated with organized crime: murder, extortion, illegal gambling, bribery, money laundering, narcotics trafficking, perjury, and obstruction of justice. As portrayed in the various indictments, Flemmi's criminal career has followed a tortuous path. A 1994 indictment, 94–CR–10287–MLW, in its various permutations, described the roles played by Flemmi and a fugitive codefendant, James Bulger, in a criminal enterprise variously known as the Winter Hill Gang or South Boston (or more lately as the "Bulger Group"), and their treacherous, if lucrative, criminal partnership with Francis Salemme and an Italian criminal syndicate known as the Patriarca family. Framed principally under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, the 1994 indictment charged a scheme under which the two criminal organizations milked the pro-

ceeds of illegal gambling, loansharking, and corrupt labor activity in Boston and elsewhere by extortionate means including murder and attempted murder. The 1994 indictment set out a murder conspiracy and four murders as predicate acts, together with twenty extortions, each involving a different victim. The instant 1999 Third Superseding Indictment is largely a sequel to the 1994 action, although according to the government:

> [T]he 1999 Action alleged both a RICO enterprise and a pattern of racketeering activity that bore no meaningful similarity to its counterparts in the 1994 Action. The enterprise at issue in the 1999 Action consisted exclusively of Flemmi, Bulger and their Winter Hill Gang.... Gone was any mention of Salemme and his LCN organization which constituted a sizeable portion of the enterprise in the 1994 Action. Gone too was any mention of Carucci, Flemmi's partner in the in the 1997 Action. Consistently, the pattern of racketeering activity in the 1999 Action differed thoroughly ....

Government's Opposition, at 7.

The 1999 predicate acts name thirty-six victims of the Bulger Group, nineteen of whom were murdered, and another seventeen who escaped with their lives, but not their property. The 1999 indictment fur-

ther expands on the Bulger Group's crimes by focusing on a money laundering scheme involving property at 295 and 309–325 Old Colony Avenue and 337 West Fourth Street, the South Boston Liquor Mart, and the Rotary Variety Store in South Boston, the distribution of narcotics in South Boston, and specific instances of perjury and obstruction of justice. Nonetheless, as Flemmi points out, as between the two indictments, the enterprises alleged are similar in terms of their alleged means and objectives and the nature of the crimes committed in furtherance of their affairs; the members and victims overlap; and many of the witnesses who are expected to testify at the trial of the 1999 action were also slated to testify at the trial of the 1994 indictment.[1]

■ It is the overlap between the 1994 and the 1999 indictments that gives rise to the instant motion, which seeks dismissal of the racketeering, extortion, and money laundering counts on "principles of res judicata." What the motion requires this court to decide is whether a prior action of a district court purporting to dismiss the unresolved counts of the 1994 action "with prejudice" acts as a bar to the prosecution of all or some of the substantive counts contained in the 1999 indictment.[2]

---

1. The intervening 1997 indictment is of less interest. It charged Flemmi and a codefendant, Michael Carucci, who is not alleged to have participated directly in the affairs of the Bulger Group, with conspiring to launder some of the Bulger Group's criminal proceeds through quasi-legitimate real estate investments. Flemmi concedes that the allegations of the 1997 indictment involve different financial transactions than those alleged in the instant indictment.

2. Flemmi's motion also cites double jeopardy as a ground for dismissal, although no argument is developed to support this contention for two obvious reasons. First, Flemmi has never been placed in jeopardy, that is, actual-

ly tried on any of the 1994 offenses. Second, had such a trial occurred, and even assuming an identity between the enterprises alleged, for double jeopardy purposes " 'enterprise' and 'pattern of racketeering activity' are separate elements of § 1962(c), both of which must be proven by the government." *United States v. Ciancaglini*, 858 F.2d 923, 928 (3d Cir.1988). Whatever "overlap" may exist between the enterprises alleged in the 1994 action and the 1999 action, no contention could be made that there is any "identicality" between the predicate acts alleged in the two actions. *See United States v. Flemmi*, 108 F.Supp.2d 39, 57–62 (D.Mass.2000) (Wolf, J.), *rev'd on other grounds*, 245 F.3d 24 (1st Cir. 2001).

The essential background is as follows. The 1994 proceedings were prolonged and punctuated by sensational revelations regarding the involvement of agents of the Federal Bureau of Investigation (FBI) in a corrupt arrangement to protect James Bulger and the worst excesses of his gang. *See United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999). As pretrial proceedings progressed, the government, capitalizing on information unearthed by Judge Wolf's meticulous excavations, on November 17, 1999, initiated the instant action. On April 27, 2001, Flemmi accepted an offer from the government to dispose of the 1994 and 1997 indictments by entering a plea of guilty to a superseding information tailored to six counts of extortion and the separately charged money laundering conspiracy. In its relevant particulars, the plea agreement recited as follows.

> The parties also agree that the fact of Defendant's plea of guilty, and any admissions pursuant to Defendant's plea of guilty, will not be used as evidence directly against Defendant in the case pending before the Honorable Richard G. Stearns as Criminal No. 99–10371–RGS. Further, the U.S. Attorney agrees not to file a superceding indictment in Criminal No. 99–10371–RGS which contains any counts to which Defendant has plead guilty in this case . . . or any counts or racketeering acts dismissed pursuant to this plea agreement. None of the extortion victims named in the Superseding Information will be called by the U.S. Attorney as witnesses at trial in Criminal No. 99–10371–RGS nor will the U.S. Attorney attempt to use the grand jury testimony of the extortion victims named in the Superseding Information as evidence at trial in Criminal No. 99–10371–RGS. . . .
>
> The parties agree that this agreement does not preclude the U.S. Attorney from calling any extortion victims not named in the Superseding Information as witnesses at trial in Criminal No. 99–10371–RGS.
>
> The parties agree that this agreement does not preclude other government witnesses at trial in Criminal No. 99–10371–RGS from referring to any of the extortion victims named in the Superseding Information or preclude government counsel at trial in Criminal No. 99–10371–RGS from eliciting testimony or other evidence about the extortion victims named in the Superseding Information. The parties further agree that this agreement does not preclude the U.S. Attorney from impeaching Defendant at any trial at which Defendant testifies, including Criminal No. 99–10371–RGS, and such impeachment may include references to or use of Defendant's plea of guilty and any admissions made pursuant to Defendant's plea of guilty.

At the plea colloquy, Judge Wolf, while outlining his understanding of the terms of the plea agreement, cautioned that the agreement (and a companion agreement in a related case before Judge Tauro [3]) "do not address the RICO murder charges against Mr. Flemmi in the case before Judge Stearns except by excluding the use of certain evidence in certain circumstances." May 16, 2001 Tr. at 7.[4] On Au-

---

3. The case pending before Judge Tauro involved one of the compromised FBI agents.

4. This admonition was repeated on at least three other occasions by Judge Wolf. See Tr. at 19 ("[I]f I accept your plea . . . that may clear the way for the government to proceed in the prosecution of the RICO charges against you pending before Judge Stearns."); Tr. at 20 ("[T]his will clear these cases away and may facilitate the progress of the case before Judge Stearns."); Tr. at 37 ("[This plea agreement] resolves some but not all of the

gust 21, 2001, at Flemmi's sentencing hearing, Judge Wolf accepted the plea agreement (which had been offered pursuant to former Fed.R.Crim.P. 11(e)(1)(C)), imposed the agreed sentence, and then proceeded to dismiss the outstanding First, Second, Third and Fourth Superseding Indictments by endorsing the government's Rule 48(a) motion to dismiss with a margin note indicating that the dismissals were "with prejudice." It is this last action that prompted Flemmi's claim that under the doctrine of "res judicata," a dismissal of the instant action is mandated.

Res judicata is a concept of merger and bar that originated in the civil law to prevent litigants from prolonging a lawsuit by splitting claims and defenses that arise from the same transaction into separate (and serial) causes of action. *See Puerto Rico Maritime Shipping Auth. v. Federal Maritime Commission,* 75 F.3d 63, 66 (1st Cir.1996). In its simplest terms, res judicata "refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit." *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). In modern usage, courts have come to understand that "res judicata" consists of two components, claim preclusion (merger and bar), and the separate doctrine of collateral estoppel or issue preclusion.[5] A legacy of imprecise usage, however, has been the source of much confusion, much of it engendered by the Supreme Court itself. In *United States v. Oppenheimer,* 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916), Justice Holmes, in rejecting the government's contention that "res judicata" had no application in criminal cases beyond the constitutional protection against double jeopardy, addressed the preclusive consequences of the defendant's successful interposition of a statute of limitations defense.

> Upon the merits the proposition of the Government is that the doctrine of *res judicata* does not exist for criminal cases except in the modified form of the Fifth Amendment that a person shall not be subject for the same offense to be twice put in jeopardy of life or limb; and the conclusion is drawn that a decision upon a plea in bar cannot prevent a second trial when the defendant has never been in jeopardy in the sense of being before a jury on the facts of the offence charged.... It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt. It cannot be that a judgment of acquittal on the ground of the statute of limitations is less a protection against a second trial than a judgment upon the ground of innocence, or that such a judgment is any more effective when entered after a verdict than if entered by the Government's consent before a jury is empaneled; or that it is conclusive if entered upon the general issue, but if upon a special plea of the statute, permits the defendant to be prosecuted again.

*Id.* at 87, 37 S.Ct. 68 (internal citation omitted). What Justice Holmes had in mind was the estoppel effect of an adjudication on the merits, and despite his rhetorical reference to *"res judicata,"* did not

---

charges against him. It doesn't resolve the RICO murder charges pending before Judge Stearns.").

**5.** Res judicata in modern parlance has lost its collective meaning and is used solely as a synonym for claim preclusion, if used at all. *See* 18 *Moore's Federal Practice,* § 131.10[1][b], at 131–16 (Matthew Bender 3d ed.2003).

suggest that the civil doctrine of claim preclusion was in any sense at issue. The habit of describing the preclusive effect of a prior judgment on the merits using "res judicata" as shorthand, however, proved enduring, at least until *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), where the Court made clear that a more specific doctrine, collateral estoppel—the principle "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit"—had been declared by Justice Holmes "more than 50 years ago in *United States v. Oppenheimer* " to be an established rule of federal criminal law.[6] *Id.* at 443, 90 S.Ct. 1189. As the government accurately points out in its opposition brief, at 16, "the Supreme Court has never recognized *res judicata* in the sense of claim preclusion as applicable to a criminal proceeding; it has never precluded prosecution on a charge which had not been but might have been prosecuted in a previous criminal proceeding."

■ While this is true, it does not answer the question of whether Judge Wolf's entry of a dismissal with prejudice in the 1994 action operates as a bar to the prosecution of the core offenses of the instant indictment. This is so because *United States v. Cunan,* 156 F.3d 110, 114 (1st Cir.1998), the principal case upon which Flemmi relies, seems to suggest that claim preclusion applies in a federal criminal proceeding when a prior unlitigated claim has been dismissed with prejudice. *Cunan* involved an attempt by the government to resuscitate a civil forfeiture action that it had previously dismissed with prejudice in anticipation of the criminal trial of the underlying offenses. The Court of Appeals, in affirming the dismissal of a forfeiture verdict in the criminal action on res judicata grounds, held that "the federal doctrine of *res judicata,* or claim preclusion, bars a subsequent action whenever three criteria are met: (1) there is a final judgment on the merits in an earlier action; (2) 'sufficient identity' exists between the parties in the earlier and later suits; and (3) 'sufficient identity' exists between the causes of action in the two suits. " *Id.* As for a judgment on the merits, the Court of Appeals observed that "a voluntary dismissal with prejudice is ordinarily deemed a final judgment that satisfies the *res judicata* criterion." *Id.*[7]

*Cunan* is not an easy case and can only be understood in its peculiar factual context. The case began with a New Hampshire and two Maine civil actions seeking forfeiture of a business and real estate alleged to have been acquired with drug

---

6. There is no tension between *Ashe* and Justice Holmes' rejection of the proposition that "res judicata" in a criminal case is limited to the operation of the Double Jeopardy Clause. Because collateral estoppel is fact-centered rather than offense focused, "a prosecution permissible under the Double Jeopardy Clause may be proscribed under the collateral estoppel doctrine where a previous acquittal bars the litigation of facts essential to the government's case." *United States v. Lanoue,* 137 F.3d 656, 662 (1st Cir.1998).

7. The elements of a successful claim of collateral estoppel differ in key essentials. "When there is an identity of the parties in subsequent actions, a party must establish four essential elements for a successful application of issue preclusion to the later action: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding final judgment; and (4) the determination of the issue must have been essential to the judgment." *Grella v. Salem Five Cent Savings Bank,* 42 F.3d 26, 30 (1st Cir.1994). As Flemmi cannot satisfy the second and fourth elements of a collateral estoppel claim, he properly does not argue that issue preclusion applies in his case.

trafficking proceeds. Cunan interposed claims to the property and so matters stood until a Massachusetts criminal indictment based on the underlying criminal activity of Cunan and others intervened. The United States then moved to dismiss the Maine civil actions, agreeing somewhat inexplicably to a dismissal with prejudice in one of the two proceedings, while taking no position on Cunan's objection that the dismissal of the other, initially entered without prejudice, should be similarly pretermitted (which it was). Thereafter, the Massachusetts district court allowed a motion to dismiss the criminal forfeiture count of Cunan's indictment on grounds of claim preclusion because of the dismissals with prejudice. This decision the Court of Appeals vacated as premature. The New Hampshire civil action in the meantime had been stayed, but upon expiration of the stay (and after some inspired maneuvering by Cunan), the United States, to avoid the deposition of witnesses in the pending criminal trial, also agreed to a dismissal with prejudice. The criminal case then went to trial with an ultimate victory for the government on the criminal forfeiture count of the indictment. The Massachusetts district court, however, in a post-trial ruling, reinstated its original decision that the forfeitures were barred by res judicata. As the Court of Appeals described the landscape: "When the dust settled, then, the government was left with successful prosecutions ... and confirmation that the properties at issue in this case were forfeitable ... but a ruling from the Massachusetts District Court that negated the criminal forfeitures." 156 F.3d at 114. Ultimately, the Court of Appeals

agreed with the district court "that *res judicata* bars a criminal forfeiture following dismissal with prejudice of a prior civil forfeiture proceeding involving the same property." *Id.* at 120. How the Court reached this conclusion is, however, more significant than the holding.

Without unduly repeating the reasoning of the opinion, the following points are worth noting. The authority cited by the *Cunan* panel for the proposition that a dismissal with prejudice constitutes a final and binding judgment for res judicata purposes is drawn exclusively from civil cases and Fed.R.Civ.P. 41.[8] *See id.* at 114. While the Court agreed that a criminal prosecution and a claim for a civil remedy "are distinct causes of action that may be pursued independently," was supported by "ample authority," *id.* at 115, it concluded that there was no reason to segregate the forfeiture actions at issue into civil and criminal categories.

> None of the cases and treatises noted ... dealt with a situation in which the civil and criminal actions sought precisely the same outcome, the forfeiture of the identical pieces of property. The distinction ordinarily is drawn between a prosecution for criminal conduct, punishable by incarceration, and a civil action that seeks to impose some other remedy or sanction. Here, although the structural criminal/civil difference remains, the substantive issue and the government's objective are the same in both settings. Indeed, the government's basis for dismissing the civil proceedings was that they were duplicative of the criminal action.

---

8. The same is true for the majority of the cases cited in Flemmi's brief (*Cunan* being the possible exception). *White v. United States,* 377 F.2d 948 (D.C.Cir.1967), one of the few criminal cases cited by Flemmi as support for the proposition that a dismissal of an indict-

ment with prejudice has claim preclusive effect, is a one paragraph *per curiam* opinion from which it is impossible to glean the basis upon which the dismissal had entered in the district court.

*Id.* at 115–116. That the Court essentially saw a criminal forfeiture proceeding as an ancillary form of civil action is reinforced in footnotes 6 and 7 of the opinion where the Court pointed out that labels aside, the procedure prescribed in prosecuting an *in personam* forfeiture is identical for all practical purposes to that followed in pursuing a civil claim and that in both *in personam* and *in rem* proceedings the same burden of proof by a preponderance of the evidence was at play.[9] It was undoubtedly for this reason, that the Court of Appeals, in deciding that principles of res judicata applied in the peculiar circumstances of the *Cunan* case, looked to the civil rules rather than Criminal Rule 48 in explaining its decision.

Rule 48(a) of the Federal Rules of Criminal Procedure provides:

Dismissal.

By the Government. The government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent.[10]

The stipulation that a dismissal is only effective with the leave of court is something of a curiosity. As one authoritative text comments:

At common law the prosecutor could enter a nolle prosequi without approval of the court. This was the rule recommended to the Supreme Court by the Advisory Committee on Criminal Rules, but the Court itself, on promulgating the rules, added the requirement in Rule 48(a) that only by leave of court could the prosecution file a dismissal. The reason for this action by the Court is unclear. It has been read as an expression by the Court of a belief that entry of a nolle prosequi should be a permissive right only, and as intended to prevent harassment of a defendant by charging, and then dismissing without placing a defendant in jeopardy.

Wright & Miller, *Fed. Prac. & Proced. Crim.2d* § 812, at p. 197.[11] *See also United States v. Garcia–Valenzuela,* 232 F.3d 1003, 1007–1008 (9th Cir.2000).

The scope of the discretion that the insertion of the words "leave of court" was intended to confer, as the Supreme Court itself has acknowledged, has never been delineated by that Court. *Rinaldi v. United States,* 434 U.S. 22, 29 n. 15, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977). Cases decided by lower courts attempting to give content to the phrase have almost uniformly fallen into two categories, those holding

---

**9.** In this respect the *Cunan* Court was following the prevailing view. *See United States v. Riley,* 78 F.3d 367, 369 n. 3 (8th Cir.1996) ("[P]ostconviction proceedings to recover forfeited property are considered civil for purposes of [Fed. R.App. P. 4]."); *United States v. Lavin,* 942 F.2d 177, 182 (3d Cir.1991) ("[A] hearing to adjudicate the validity of a third party's interest in forfeited property is not a criminal *prosecution,* i.e., an action commenced by the government to secure a sentence of conviction for criminal conduct.").

**10.** The language quoted is the Rule as it appears after the 2002 restyling of the Criminal Rules "to make them more easily understood." As the Reporter's notes indicate, the changes are stylistic only. Rule 48(b) permits

the court to dismiss an indictment in cases of "unnecessary delay" in making a presentment to the grand jury or bringing a defendant to trial. Flemmi does not make a claim of undue delay.

**11.** The common law rule was summarized by the Supreme Court in *Confiscation Cases,* 74 U.S. 454, 457, 7 Wall. 454, 19 L.Ed. 196 (1868), as follows: "Public prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney, and even after they are entered in court, they are so far under his control that he may enter a *nolle prosequi* at any time before the jury is empaneled for the trial of the case, except in cases where it is otherwise provided in some act of Congress."

that the grant of judicial discretion is intended "to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection," and those holding that Rule 48(a) permits "the court to deny a Government motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest." *Id.* Cases illustrative of the latter purpose include *United States v. Freedberg*, 724 F.Supp. 851, 854 (D.Utah 1989) (plea agreement dismissing charges against a corporation's owner and requiring the corporation to "take the rap" in his stead was manifestly contrary to the public interest); *United States v. Nederlandsche Combinatie Voor Chemische Industrie*, 75 F.R.D. 473, 474–475 (S.D.N.Y.1977) (government's proposed dismissal of a corporate conspiracy case involving essential life-saving drugs was contrary to the manifest public interest); *United States v. Bettinger Corp.*, 54 F.R.D. 40, 41 (D.Mass.1971) (corporation's post-indictment compliance with environmental laws did not justify the dismissal of the case against the criminally complicit corporation president). *See also United States v. Ammidown*, 497 F.2d 615, 622 (D.C.Cir.1973) ("[A]uthority has been granted to the judge to assure protection of the public interest"). *Cf. In re Richards,* 213 F.3d 773, 788 (3d Cir.2000) ("Even though a judge's discretion under Rule 48(a) is severely cabined, the rule may serve an important interest as an information—and accountability—producing vehicle.").[12] Cases illustrating the former purpose include *United States v. Hamm*, 659 F.2d 624, 628 (5th Cir.1981) ("[T]he 'leave of court' requirement of Rule 48(a) is primarily intended to protect the defendant against prosecutorial harassment"); *United States v. Strayer*, 846 F.2d 1262, 1265 (10th Cir.1988) (same).[13]

By its own terms, Rule 48(a), refers to dismissals by the government, rather than dismissals entered by the court. Strictly speaking, it might be argued that the endorsement of the judge in this case was ultra vires, as Rule 48(a), unlike Rule 48(b), does not authorize a judge to dismiss an indictment, but only to grant or withhold approval of the government's motion to dismiss. Almost all of the decided cases proceed on this assumption, and almost all arise in the context of a judge's refusal to grant leave to the government to enter an uncontested motion to dismiss. Nonetheless, an occasional case like *United States v. Rossoff*, 806 F.Supp. 200, 202 (C.D.ILL.1992), interprets Rule 48(a) as authorizing a court to enter a dismissal on its own motion where it perceives that the interests of justice so require.[14] My as-

---

**12.** As Judge Becker observed in *In re Richards*, Rule 48(a) "is a strange animal"—a procedural rule "adorned with unmistakable substantive trappings." These "trappings" led Judge Becker to question whether the Rule, as written, possibly violated the Rules Enabling Act. *Id.* at 786.

**13.** That harassment or concerns about a fundamental miscarriage of justice were not what Judge Wolf had in mind in endorsing the government's motion to dismiss with prejudice is made clear by the transcript of the plea proceeding in which he repeatedly reminded Flemmi that the RICO murder indict-

ment would go forward even were he to accept the plea agreement.

**14.** In *Rossoff*, the government twice unsuccessfully tried an elderly veterinarian for violating Food and Drug Administration regulations concerning the sale of bulk animal drugs to largely disbelieving juries. The trial judge then dismissed the indictment with prejudice over the government's objection after determining that a third trial was "against the concept of fundamental fairness." *Id.* at 203. The judge relied on a District of Columbia case, *United States v. Ingram*, 412 F.Supp. 384, 385–386 (D.D.C.1976), which recom-

sumption, which is based on the plea colloquy, is that Judge Wolf was not acting with Rule 48(a) in mind, but intended to do no more than to perpetuate the plea by precluding the government for whatever reason from attempting to revive the 1994 action.[15] *See United States v. Raineri,* 42 F.3d 36, 43 (1st Cir.1994) (suggesting that forcing the government to accept a dismissal with prejudice might be appropriate as a mechanism for fully enforcing the terms of a negotiated plea).[16] In most of the cases in which a trial court has taken it upon itself to enter a *sua sponte* dismissal of an indictment with prejudice as a sanction for perceived prosecutorial misconduct or to achieve an outcome deemed just, the decision has been reversed on appeal. A case on point is *United States v. Walsh,* 7 F.3d 1064 (1st Cir.1993). In *Walsh,* the

well-intentioned judge, having prompted a defendant to withdraw a guilty plea to an information, attempted to preserve the benefit of the annulled plea bargain after the government announced its intention to pursue a grand jury indictment by dismissing the information with prejudice. . While the authority relied upon by the judge to enter a dismissal with prejudice is not specified in the opinion, the disapproval by the Court of Appeals of the trial judge's explanation that the government's conduct amounted to "prosecutorial harassment," makes it reasonably clear that Rule 48(a) was in play. Although the Court affirmed the dismissal of the information, it ordered the dismissal to be entered without prejudice, observing that "while there appears to be no law on the point, dismissal with prejudice might raise questions of double

mended that in considering the fairness of a retrial, a court weigh the potential strain on the defendant, the number of unsuccessful retrials, the burden on the witnesses, and the urgency of more significant court business. The *Rossoff* court also cited *United States v. Derr,* 726 F.2d 617, 619 (10th Cir.1984), where the Circuit Court upheld a dismissal with prejudice after the government on the day of trial entered a dismissal because it was unprepared to try the case. Neither of these cases is apposite on its facts.

15. The government, of course, could have avoided this entire problem by filing a motion seeking leave to dismiss the outstanding 1994 counts in conformity with Rule 48(a), rather than filing as it did a generic "motion to dismiss." Dismissals sought by the government under Rule 48(a) are customarily without prejudice, *see Raineri,* 42 F.3d at 43, although instances can be found where the government as part of a plea agreement has undertaken to dismiss one or more outstanding charges with prejudice, *see United States v. Friedman,* 107 F.R.D. 736, 737 (N.D.Ohio 1985), as well as a few cases in which a dismissal with prejudice has been upheld because of the government's failure to object.

16. In *Raineri,* the government, after agreeing that the defendant faced a maximum sentence

of ten years on a particular count of the indictment, discovered after the plea that because of unknown prior convictions the actual sentence was a mandatory fifteen years. To preserve the plea, the government moved to dismiss the count under Rule 48(a). Raineri later complained that the count had been improperly dismissed as a means of thwarting his attempt to withdraw his plea. Agreeing that a dismissal without prejudice disadvantaged Raineri by leaving open the prospect that the government, after having salvaged the plea, might attempt to reindict and prosecute Raineri on the dismissed count, the Court of Appeals put the government to the choice of accepting a dismissal with prejudice or proceeding to trial on all counts. "[T]he choice to forego a prosecution is ordinarily made by the executive branch. . . . Thus, while a dismissal of count 28 with prejudice is a quid pro quo for retaining the guilty pleas on counts 14 and 24, we think there is no reason to compel the government to accept a dismissal with prejudice if it wants to surrender the guilty plea and give the defendant the trial he is demanding." *Id.* at 43. Here, of course, Flemmi is not seeking to reinstate the charges dismissed by the government or the charges to which he plead guilty.

jeopardy or *res judicata.*[17] *Id.* at 1066.

Assuming, as many courts do, that a court possesses the inherent authority to foreclose or preclude a prosecution on its own initiative over the objection of the executive,[18] there is a very good reason, apart from the instructive wisdom of the common law, to closely regulate the exercise of such a judicial power. The exclusive right vested in the executive to exercise the writ of nolle prosequi is based on the constitutional separation of powers, under which the judicial branch has neither the power to command a prosecution (with the exception of a contempt of its own authority, *see* Rule 42(a)(2)), nor to terminate a prosecution without the consent of the executive, except in instances of undue delay, *see* Rule 48(b), or egregious government misconduct, *see Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The reasons why this is so were stated by the Supreme Judicial Court of Massachusetts in an opinion admonishing a trial court for dismissing a prosecution on its own initiative (and over the prosecutor's objection) out of its own sense of justice. *Commonwealth v. Brandano*, 359 Mass. 332, 269 N.E.2d 84 (1971). Expressing "serious doubt as to the power of a [trial] court to enter such an order," *id.* at 335, 269 N.E.2d 84, the Supreme Judicial Court quoted from a seminal nineteenth century case, *Commonwealth v. Hart*, 149 Mass. 7, 8–9, 20 N.E. 310 (1889): "Only an attorney authorized by the Commonwealth to represent it has authority to declare that he will not further prosecute a case in behalf of the Commonwealth. A court is not a prosecuting officer, and does not act as an attorney for the [C]ommonwealth. It's office is judicial—to hear and determine between the [C]ommonwealth and the defendant." *Id.* "There exists," the *Brandano* Court concluded, "the 'danger that the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of other departments and hence leave no law to be enforced.'" *Id.* at 336, 269 N.E.2d 84, quoting *Ex parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72, 61 L.Ed. 129 (1916). *See also Newman v. United States*, 382 F.2d 479, 480 (D.C.Cir.1967) (Burger, J.) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought."); *Smith v. Magras*, 124 F.3d 457, 465–466 (3rd Cir.1997) ("[A]s a general rule inherent in the American constitutional system . . . unless otherwise expressly provided or incidental to the power conferred . . . the judiciary cannot exercise either executive or legislative power."); *United States v. Smith*, 55 F.3d 157, 160 (4th Cir.1995) (the weighing of laudable objectives advanced by the court and the government in determining the propriety of the denial of a Rule 48(a) motion "does not give adequate recognition to the Executive in the context of the Separation of Powers Doctrine.").

**17.** The reference to double jeopardy in *Walsh* is puzzling as the defendant was never put to trial, a *sine qua non* for the application of the Double Jeopardy Doctrine.

**18.** This may be an overstatement. The "inherent" authority of the court is usually invoked to vindicate measures undertaken by a court to protect its internal processes from abuse. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud"). These cases, however, usually arise in a civil context where the court's power to dismiss (or vacate a judgment) as an ultimate sanction for a fraud on the court is well established.

In sum, while I am not prepared to go as far as the government urges by holding that there can never be a criminal case in which a trial court can properly enter a *sua sponte* Rule 48(a) dismissal with prejudice, or that such a dismissal could never have a claim preclusive effect, I believe that the reasons militating against such dismissals in the absence of any risk of fundamental unfairness outweigh any conceivable justification for the entry of a dismissal with prejudice in this case.[19] Consequently, if it was Judge Wolf's intention (which I strongly doubt) to interpose a preclusion bar of any kind on the prosecution of this indictment (beyond the evidentiary restrictions recited in the plea agreement), he exceeded any authority granted by Rule 48(a) or the Constitution, or any authority derived from the court's inherent protective power. Therefore, the dismissal with prejudice has no force or effect on the trial of the instant case.

## *ORDER*

For the foregoing reasons, the motion to dismiss on grounds of "res judicata" is *DENIED.*

SO ORDERED.

---

**19.** While no First Circuit case is directly on point, the favorable citation in *Raineri* to *Rossoff's* "fundamentally unfair" standard is rea-son enough for caution on this point. *See Raineri,* 42 F.3d at 43.