# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 7, 2009

Charles R. Fulbruge III
Clerk

No. 08-50400

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOSE GARCIA-QUINTANILLA

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, GARZA, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

An immigration judge ordered Appellant Jose Garcia-Quintanilla, a Salvadoran native and citizen, removed to El Salvador. As a necessary step in his removal, Garcia-Quintanilla needed to interview with Salvadoran officials. He refused, however, to participate in such an interview, insisting that he would rather spend his life in a United States prison than return to El Salvador. As a result, Garcia-Quintanilla was convicted of failing to depart under 8 U.S.C. § 1253.

In light of Garcia-Quintanilla's insistence that he would never cooperate in his removal, the district court fashioned a unique sentence. The court sentenced Garcia-Quintanilla to the statutory maximum of four years'

imprisonment, a sentence eight times greater than his Guidelines-recommended maximum of six months. The district court also reserved the right to later suspend Garcia-Quintanilla's sentence—even after the sentence had begun—if he decided to cooperate in his removal. Garcia-Quintanilla now appeals this sentence.

We must decide whether § 1253(a)(3) authorizes the suspension of a failure-to-depart sentence after the sentence has begun. We hold that it does not, as we find nothing in the statute indicating that Congress intended to give courts this unique suspension power. Because the district court sentenced Garcia-Quintanilla to the statutory maximum under the mistaken belief that it could later suspend this sentence, we vacate his sentence and remand for resentencing.

## I. BACKGROUND

Born in El Salvador, Garcia-Quintanilla entered the United States in 1987 at the age of sixteen. Almost twenty years later, immigration authorities arrested Garcia-Quintanilla, and an immigration judge ordered him removed to El Salvador. Before he could be removed, Garcia-Quintanilla needed to speak with officials in the Salvadoran consulate. Without this interview, the consulate would not issue Garcia-Quintanilla the travel documents necessary to complete his removal. Apparently believing that he was legally in the country, Garcia-Quintanilla refused to participate in this interview. Immigration authorities attempted to explain to him the necessity of speaking with consular officials as well as the potential criminal consequences of his actions. Still, Garcia-Quintanilla persisted in his refusal.

The Government then charged Garcia-Quintanilla with willfully failing and refusing to make a timely application for necessary travel documents in violation of 8 U.S.C. § 1253(a)(1)(B). Up until the eve of trial, the Government offered to drop the charges if Garcia-Quintanilla would cooperate in his removal.

Garcia-Quintanilla refused these offers, and a jury later found him guilty.

With an offense level of eight and no criminal history, Garcia-Quintanilla's Guidelines-recommended sentence was zero-to-six months' imprisonment. His presentence report gave no reason to deviate from this range. The Government moved for an upward variance, however, due to what it characterized as Garcia-Quintanilla's blatant disregard for immigration laws. It asked the district court to impose the statutory maximum of four years, suggesting that such a sentence would deter Garcia-Quintanilla from persisting in his refusal to speak with the Salvadoran consulate. Acknowledging the harshness of such an extreme variance, the Government justified the sentence by suggesting that § 1253(a)(3)—the statute's suspension provision—would mitigate this harshness. As discussed further below, § 1253(a)(3) permits a district court to suspend a failure-to-depart sentence and includes a non-exhaustive list of considerations for determining whether suspension is proper. The Government focused on § 1253(a)(3)(D), which requires consideration of "the character of the efforts made by [the] alien himself . . . to expedite the alien's departure from the United States." According to the government, § 1253(a)(3)(D) authorized suspension of Garcia-Quintanilla's sentence if he ever decided to cooperate in his removal and interview with the Salvadoran consulate. In the Government's words, Garcia-Quintanilla would "hold the keys to his own cell."

At sentencing, the district court expressed concern over Garcia-Quintanilla's refusal to cooperate in his removal. The court stated,

> My concern . . . is he'll serve, let's say, if I go with the six months at the top of the Guidelines, and the range is six months, and then we go through this whole charade over again, affording him his day in court, affording him his jury trial. And I guess the—the Guidelines would change, in terms of criminal history, certainly, with this. But is it a smart use of resources to continue to prosecute it piecemeal when, in fact, one can accomplish the very thing that could be of the best benefit to [Garcia-Quintanilla], should he decide to simply

3

> comply with the process and be removed pursuant to the order of
> the immigration judge?

The district court attempted to fashion a sentence that would either incentivize Garcia-Quintanilla to cooperate in his removal or mitigate the cost of repeatedly trying him for nearly-identical offenses. The court found the tool for such a sentence in § 1253(a)(3), agreeing with the Government that § 1253(a)(3)(D) allowed the suspension of Garcia-Quintanilla's sentence were he to ever cooperate. Of particular importance, the district court believed that it could use this suspension power even after the sentence of imprisonment began.

Thus, instead of the Guidelines-recommended sentence of zero-to-six months, the district court sentenced Garcia-Quintanilla to the statutory maximum and reserved the right to suspend that sentence. Were Garcia-Quintanilla to decide to cooperate, the district court would suspend his sentence and release Garcia-Quintanilla to the custody of immigration authorities. This could apparently occur at any time after the sentence began; Garcia-Quintanilla could leave prison after six months—indeed, after six days—and the upward variance would thus be irrelevant. If, on the other hand, he persisted in his refusal, he would remain imprisoned for the full four years, maximizing the time between trials.

## II.  STANDARD OF REVIEW

Garcia-Quintanilla argues only that the district court erred in holding that § 1253(a)(3) permitted suspension of his sentence *after* he began serving it. The Government contends that Garcia-Quintanilla did not raise this issue below, which would require us to review the sentence for plain error. We agree with the Government. Although Garcia-Quintanilla made a general objection to the legality of his sentence, this objection was insufficient to place the district court on notice of the issue he now raises.

We therefore review only for plain error. Under this standard of review,

the defendant must show (1) an error, (2) that the error was clear, and (3) that the error affected the defendant's substantial rights. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009). If the defendant establishes these three requirements, we may exercise our discretion to address that error so long as it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See id.*

As to the underlying error, we review Garcia-Quintanilla's sentence for reasonableness, asking whether the district court abused its discretion. *See Gall v. United* States, 552 U.S. 38, 128 S. Ct. 586, 597 (2008); *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). A district court abuses its discretion if it bases a decision on an error of law. *United States v. Castillo*, 430 F.3d 230, 238 (5th Cir. 2005). We review issues of law, including statutory interpretation, de novo. *United States v. Jackson*, 559 F.3d 368, 370 (5th Cir. 2009); *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## III. DISCUSSION

In sentencing Garcia-Quintanilla, the district court may have found a reasonable and practical method for resolving a legitimate issue. But this approach has one potential pitfall: as Garcia-Quintanilla asserts, Congress did not intend for § 1253(a)(3) to authorize the suspension of a failure-to-depart sentence after that sentence has begun. The Government retorts with two theories. It first reads § 1253(a)(3) to expressly allow district courts to suspend a failure-to-depart sentence at any time. Under this reading, a failure-to-depart sentence itself can potentially include conditions of suspension. Alternatively, the Government directs us to 18 U.S.C. § 3582(c)(1)(B), which allows district courts to modify a term of imprisonment once it has been imposed when "expressly permitted by statute." The Government contends that § 1253(a)(3) is one of the statutes that § 3582(c)(1)(B) contemplates, i.e., § 1253(a)(3) expressly permits district courts to modify a term of imprisonment. We address

each argument in turn.

## A.    Section 1253(a)(3)

The Government first contends that § 1253(a)(3) expressly authorizes district courts to suspend a failure-to-depart sentence.  As a general matter, this is probably correct; the statute clearly contemplates suspension in some circumstances.[1]  But the question in this appeal is when that power to suspend exists and when it does not.

The Government sees no temporal limit in § 1253(a)(3), essentially reading the statute as authorizing a district court to include terms of suspension as part of the initial sentence.  Under this reading, a district court could sentence a defendant to a term of imprisonment but—as part of the sentence—reserve the right to suspend that sentence under certain circumstances (as the district court did in the present case).  Thus, so long as suspension is part of the sentence itself, suspension at any time is merely an enforcement of the original terms of the sentence.  Garcia-Quintanilla disagrees, contending that § 1253(a)(3) does not permit a district court to suspend a sentence *after* that sentence has begun.  Under Garcia-Quintanilla's interpretation of § 1253(a)(3), suspension may take place only before the sentence begins (if ever).

---

[1] Garcia-Quintanilla seems to suggest that district courts may never suspend a failure-to-depart sentence under § 1253(a)(3), as the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987, took from district courts the ability to order a term of probation by suspending the imposition or execution of a sentence.  *See* U.S. SENTENCING GUIDELINES MANUAL ch. 7, pt. A, introductory cmt. 2(a) ("The statutory authority to 'suspend' the imposition or execution of sentence in order to impose a term of probation was abolished upon implementation of the sentencing guidelines.  Instead, the Sentencing Reform Act recognized probation as a sentence in itself.").  We need not decide this issue.  The only question in the present case is whether § 1253(a)(3) permits suspension after a sentence has begun; we can simply and safely assume that § 1253(a)(3) authorizes suspension up to the moment when a sentence begins.  We note, however, our serious doubt as to Garcia-Quintanilla's suggestion.  As discussed further below, Congress enacted § 1253(a)(3) *after* the Sentencing Reform Act.  Although the Sentencing Reform Act repealed the former 18 U.S.C. § 3651, which gave district courts the general power to suspend the imposition or execution of a sentence and order probation, we doubt that the Sentencing Reform Act somehow prospectively abrogated the later-enacted § 1253(a)(3).

We must therefore decide when Congress intended § 1253(a)(3) to apply. The text of § 1253(a)(3) is unhelpful in answering this question. Although we always begin with a statute's text, the present statute says nothing about when it applies. Section 1253(a)(3) provides:

> The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—
>
> (A)    the age, health, and period of detention of the alien;
>
> (B)    the effect of the alien's release upon the national security and public peace or safety;
>
> (C)    the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;
>
> (D)    the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;
>
> (E)    the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and
>
> (F)    the eligibility of the alien for discretionary relief under the immigration laws.

None of this language clearly addresses when § 1253(a)(3) is to apply. On its face, then, § 1253(a)(3) does not speak to whether it permits suspension before a sentence has begun, after a sentence has begun, or both. Consequently, the plain text of the statute does not answer our question.

Nor is § 1253(a)(3)'s legislative history particularly helpful in determining when Congress intended suspension to apply. Congress enacted § 1253(a)(3) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546. It appears that the IIRIRA

merely reformatted and slightly changed the language of the old 8 U.S.C. § 1252(e), which Congress had enacted as part of the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163. *See United States v. Sanchez-Mota*, 319 F.3d 1, 4 (1st Cir. 2002) (noting that "the substance of [§ 1253(e)] is now contained in 8 U.S.C. § 1253(a)"). The parties have found nothing in the history of either statute that would illuminate the present inquiry, and our own search was equally fruitless.

Thus, both the text and history of § 1253 are facially unhelpful. We find them informative, however, when we consider the historical practice of sentence suspension. Particularly illuminating is the Probation Act of 1925, Pub. L. No. 68-596, 43 Stat. 1259. Before the sentencing reforms of the 1980s, the Probation Act gave district courts the discretion to order probation in lieu of a fine or term of imprisonment. They did so by suspending either the imposition or execution of a sentence. *See* 3 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 529, at 292 (3d ed. 2004) ("If the court determined to give probation, it either imposed a sentence, suspended its execution, and placed the defendant on probation, or, in the alternative, it suspended the imposition of sentence and placed the defendant on probation."). Suspension was therefore an integral part of a federal court's ability to order probation for a criminal offense.

Two characteristics of the Probation Act inform the present issue. First, Congress passed the Act in response to the Supreme Court's decision in *Ex parte United States*, 242 U.S. 27 (1916), commonly known as the *Killits Case*. Therein, the Supreme Court held that federal district courts have no inherent authority to suspend a sentence and order probation. *Id*. at 41–52. According to the *Killits* Court, only Congress had the power to define the punishment for a crime. *Id*. at 42. Consequently, only Congress could authorize courts to order probation. *Id*. Absent congressional authorization, then, federal courts were powerless to suspend a criminal sentence and order probation.

8

Second, and more importantly, the Supreme Court later interpreted the Probation Act to permit suspension of a sentence only *before* that sentence had begun. The Court initially confronted this issue in *United States v. Murray*, 275 U.S. 347, 350–51 (1928), in which a district court had suspended a defendant's sentence one day after he began serving it. The Court held that this suspension was improper, as "[t]he beginning of the service of the sentence in a criminal case ends the power of the court . . . to change it." *Id.* at 358. Similarly, in *Affronti v. United States*, 350 U.S. 79, 79 (1955), a defendant received four consecutive five-year sentences. Midway through serving the first sentence, the defendant asked the district court to suspend his remaining sentences and order probation. *Id.* at 80. The district court held that it could not suspend a sentence after the defendant begins serving any part of it, and the Supreme Court agreed. *Id.* at 80, 83. The Court held that the power granted by the Probation Act "ceases with respect to all of the sentences composing a single cumulative sentence immediately upon imprisonment for any part of the cumulative sentence." *Id.* at 83. Thus, once the defendant began serving any one of his sentences, the district court lacked the authority to suspend his cumulative sentence. *Id.*; *see also United States v. Karp*, 764 F.2d 613, 615 (9th Cir. 1985) (noting that "the sentencing court has had the power since 1925 to order probation for a convicted defendant at any time *before* the execution of the pronounced but unexecuted sentence begins" (emphasis added)).

The historical practice of suspension thus provides important context when interpreting § 1253(a)(3). The *Killits Case* teaches us that only Congress can define federal courts' power to suspend a criminal sentence. In other words, district courts have only the power to suspend a failure-to-depart sentence that Congress intended. Further, *Murray* and *Affronti* indicate that, historically,

suspension could only take place before a defendant began serving a sentence.[2] *Murray* and *Affronti* thereby establish a baseline against which we can evaluate a statutory suspension provision: in the normal course of things, suspension occurs only before the beginning of a sentence.

Because of this norm, we would expect a relatively clear indication from Congress when it intends for a district court's suspension power to deviate from the norm, i.e., to extend beyond the commencement of a sentence. Thus, if Congress intended for § 1253(a)(3) to permit the suspension of a sentence after it has begun, we might expect Congress to say explicitly that a court may suspend a sentence *before or after* its execution, or we might expect the outlines of a procedure for bringing to the court's attention the circumstances that warrant a suspension after the sentence has begun.

Looking to § 1253(a)(3), however, we find no evidence that Congress intended to allow suspension after a sentence begins. Indeed, nowhere in § 1253(a)(3) is there any indication that Congress intended for district courts to suspend a sentence in anything but the normal course of events. Instead, § 1253(a)(3) appears to focus entirely on suspension *at the time of sentencing*. Subsection (a)(3) provides that a "court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe." It then lists several considerations for determining whether "good cause" exists, and these resemble general sentencing considerations. Section 1253(a)(3)(A), for example, includes an alien's age and

---

[2] Federal sentencing has no doubt changed since *Murray* and *Affronti*. For example, federal parole has been eliminated, and the practice of probation is substantially different. But both *Murray* and *Affronti* provide important context for understanding sentence suspension. Moreover, Congress enacted § 1253(a)(3)'s substantially-identical precursor—the former 8 U.S.C. § 1252(e)—as part of the Immigration and Nationality Act of 1952, three years before the Supreme Court decided *Affronti* and well before the sentencing reforms of the 1980s. We must therefore assume that, at the time Congress enacted the substance of § 1253(a)(3), it was aware that the Court had interpreted the Probation Act to allow suspension only before a sentence begins.

period of detention. While these make sense at the time of sentencing, they would be an odd consideration for a later modification. If a district court does not want to imprison a defendant past a certain age, then it should impose a lower sentence in the first place, not revisit the sentence once the defendant reaches that age. Similarly, subsections (D) and (E) direct a district court to consider whether the alien's departure has been impeded by the conduct of the United States or the country to which the alien is being deported. These subsections address situations in which, for reasons outside of the alien's control, she cannot leave the country. As it would be inequitable to imprison someone for reasons outside of her control, these subsections allow district courts to suspend an alien's sentence instead of sending her to jail for the failures of others.

Granted, in addition to being relevant at the time of sentencing, some of these considerations might be relevant in assessing whether an alien's sentence should later be suspended (e.g., the alien's health, which could deteriorate while imprisoned). But there is nothing among them to suggest that Congress intended for district courts to be able to suspend a failure-to-depart sentence after it has begun. And because there is nothing in § 1253(a)(3) to indicate that Congress intended to deviate from the baseline of sentence suspension, we must presume that Congress intended § 1253(a)(3) to provide for suspension when suspension has normally occurred.

The structure of the failure-to-depart statute reinforces our reading of § 1253(a)(3). The provision governing suspension falls under § 1253's subsection (a), entitled "Penalty for failure to depart." The other parts of subsection (a) deal primarily with conviction for a failure-to-depart offense; subsection (a)(1) outlines the ways in which one can commit the offense, and subsection (a)(2) provides something of an affirmative defense. Subsection (a)(3) follows immediately thereafter to finish subsection (a). The statute goes from

offense, to affirmative defense, to sentencing, and thus focuses on the commission, conviction, and sentencing for the crime. Nowhere among this section is any indicium of a procedure for reviewing or revisiting a previously-imposed sentence.

Finally, the general purposes of sentence suspension comport with our interpretation of § 1253(a)(3). As Chief Justice Taft stated in *Murray*, suspension provides "an opportunity for reform and repentance . . . before actual imprisonment should stain the life of the convict." 275 U.S. at 357. Along these lines, § 1253(a)(3) permits a district court to give an alien one last opportunity to cooperate in her removal before the Government must bear the cost of imprisonment. The district court might hope that, when faced with the reality of impending imprisonment, an alien would finally appreciate the consequences of her actions and take any necessary remedial steps. This is of course not the only reason why a district court might choose to suspend a failure-to-depart sentence. But it is a reason that comports with the historical practice of suspension.

Consequently, although § 1253(a)(3) allows for the suspension of a sentence, there is nothing to indicate that this suspension is to take place under anything but normal circumstances, i.e., before a sentence begins. There is therefore nothing in § 1253 that empowers a district court to "reserve" the authority to later suspend a failure-to-depart sentence.

## B.    Section 3592(c)(1)(B)

For many of the same reasons, we reject the Government's argument that § 1253(a)(3) expressly permits the modification of a term of imprisonment in accordance with 18 U.S.C. § 3582(c)(1)(B). Section 3582(c)(1)(B) authorizes district courts to modify a previously-imposed term of imprisonment when "expressly permitted by statute." Decisions from other courts suggest that 28 U.S.C. § 2106—the statute authorizing resentencing on remand from an

appeal—falls within this purview, as do those statutes governing resentencing after post-conviction relief. *See, e.g.*, *United States v. Penson*, 526 F.3d 331, 335 (6th Cir. 2008); *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001); *United States v. Triestman*, 178 F.3d 624, 629 (2d Cir. 1999); *United States v. Rodriguez*, 112 F.3d 26, 29 (1st Cir. 1997). Unlike those statutes, § 1253(a) does not expressly contemplate, either in its text or context, the modification of a previously-imposed sentence. Although the text addresses the suspension of a sentence, it is far from clear that § 1253(a)'s suspension provision allows a court to *revisit* a previously-imposed sentence. As discussed in the previous section, the more natural reading of § 1253(a)'s suspension provision is that it applies before a sentence begins. Therefore, § 1253(a)(3) does not expressly permit a district court to modify the term of a previously-imposed sentence.

**C.    Plain Error**

The district court erred in interpreting § 1253(a)(3). This does not end our inquiry, however, due to our plain error standard of review. Again, before we can exercise our discretion to correct this error, Garcia-Quintanilla must establish that this error was plain and affected his substantial rights. We hold that he has met this burden.

First, this error was plain. Section 1253(a)(3) provides no basis for the suspension of a failure-to-depart sentence after it begins. Granted, there was no caselaw suggesting that such a suspension was prohibited, just as there was no caselaw suggesting that it was permitted. But, as detailed above, it has long been the law that district courts cannot suspend a criminal sentence after it has begun. This error did not, therefore, merely rest on a misinterpretation of a statute. It also represented a substantial step beyond the district courts' traditional authority as defined by the Supreme Court. *See Affronti*, 350 U.S. 79*; Murray*, 275 U.S. 347. The district court plainly erred in finding § 1253(a)(3) to be a sufficient basis for such a unique power.

Second, this error affected Garcia-Quintanilla's substantial rights. In making this determination, we ask whether the error affected the outcome of the district court proceedings. *See United States v. Maturin*, 488 F.3d 657, 663 (5th Cir. 2007). In the sentencing context, we often ask whether the error increased the term of a sentence, such that there is a reasonable probability of a lower sentence on remand. *See, e.g.*, *United States v. Moreno-Florean*, 542 F.3d 445, 457 (5th Cir. 2008); *United States v. Gonzalez-Terrazas*, 529 F.3d 293, 298 (5th Cir. 2008); *United States v. Garza-Lopez*, 410 F.3d 268, 275 (5th Cir. 2005). In the present case, the district court sentenced Garcia-Quintanilla to four years' imprisonment—eight-times greater than his Guidelines-recommended maximum of six months—based on the erroneous belief that it could later suspend the sentence. And the possibility of suspension was an essential aspect of this sentence. As discussed above, in addition to punishing him for his disregard of immigration laws, the district court wanted to provide Garcia-Quintanilla with an appropriate incentive to cooperate in his removal. It therefore imposed the maximum sentence, with the necessary caveat that it could suspend the sentence if Garcia-Quintanilla chose to cooperate. In essence, the sentence was akin to civil contempt; Garcia-Quintanilla would be punished until he decided to do what the Government wanted. A necessary part of this sentence, then, was the possibility of suspension. Without it, the sentence would not have the desired effect. Because the possibility of suspension was so central to the sentence that Garcia-Quintanilla received, we cannot confidently say that the district court would have imposed the same sentence under our interpretation of § 1253(a)(3). Consequently, the error affected Garcia-Quintanilla's substantial rights.

Finally, we believe that the error seriously affects the integrity and fundamental fairness of judicial proceedings. This is due not only to the length of Garcia-Quintanilla's erroneously-imposed sentence, the magnitude of which

14

might itself be sufficient under many of our prior decisions. *See, e.g.*, *United States v. Sanchez*, 527 F.3d 463, 466 (5th Cir. 2008) (holding that an error affected the fairness of judicial proceedings when it resulted in a sentence over two times longer than the proper Guidelines range). We also find it important that, were we not to correct the error, the end result would be a sentence that no one ever intended and which the court lacked the power to craft as it did. Again, the possibility of suspension was an essential aspect of Garcia-Quintanilla's sentence. The district court thus expressly contemplated that Garcia-Quintanilla could be serving a shorter sentence—perhaps substantially shorter—than that which it actually imposed. But suspension is no longer an option. Absent correction, then, Garcia-Quintanilla would serve a four-year sentence without the possibility of suspension. Even under its erroneous interpretation of § 1253(a)(3), the district court did not intend such a sentence. We therefore exercise our discretion to correct this error and vacate Garcia-Quintanilla's sentence.

## IV. CONCLUSION

We hold that § 1253(a)(3) does not authorize a district court to suspend a failure-to-depart sentence after the alien has begun serving that sentence. Consequently, the district court's sentencing of Garcia-Quintanilla was erroneous. Moreover, Garcia-Quintanilla has satisfied the requirements of plain error review. We therefore VACATE the sentence and REMAND for resentencing.

VACATED and REMANDED.